Jeff **MOORE**, d/b/a **T & M Production**, Appellant

v.

**JET STREAM INVESTMENTS, LTD.,** Sara P. Rudd, Executrix of the Estate of J.B. Rudd, and Youngblood Properties, L.P., Appellees.

No. 06–07–00106–CV.

Court of Appeals of Texas, Texarkana.

Submitted Aug. 7, 2008.

Decided Aug. 8, 2008.

James P. Finstrom, Jefferson, for appellant.

Dean A. Searle, Marshall, for appellees.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

Jeff Moore has filed a motion for rehearing in this case, which is granted. This Court's opinion of June 12, 2008, is hereby withdrawn, and this opinion substituted therefor.

Jeff Moore, d/b/a T & M Production, appeals the final judgment of the trial court declaring that an oil and gas lease had terminated due to nonproduction. Moore had been operating as an assignee of a 1943 lease which contained a five-year primary term and continued thereafter as long as oil or gas was produced. On August 20, 2004, after Moore failed to comply with an order from the Texas Railroad Commission regarding posting financial assurance, the Commission ordered that he cease production. Production did not resume until July 15, 2005. Shortly after Moore resumed production, William L. Rudd, III, acting "[o]n behalf of the mineral owners," sent Moore a letter alleging the lease had terminated. Jet Stream Investments, Ltd., Sara P. Rudd, Executrix of the Estate of J.B. Rudd, and Youngblood Properties, L.P., brought suit seeking a declaratory judgment that the lease had terminated.

Moore filed a motion for summary judgment, and Jet Stream filed a competing motion for partial summary judgment. The trial court granted a partial summary judgment to Jet Stream and denied

Moore's motion for summary judgment. The trial court set a trial on the merits, specifically noting the following issues: (a) whether any other wells are located on the lease acreage and holding the lease, (b) the amount of damages for underpayment of royalty, (c) the amount of damages for conversion of oil and gas by Moore, and (d) the amount of attorney's fees. After the bench trial, the trial court rendered judgment in favor of Jet Stream and awarded damages in the amount of $94,752.24, plus attorney's fees. The final judgment incorporates the prior partial summary judgment.

Moore raises eight issues on appeal: 1) whether the force-majeure clause prevented cancellation of the lease despite the lack of production, 2) whether there was a fact issue on due diligence, 3) whether the lease was held by production by other operators, 4) whether the implied temporary cessation doctrine applies, 5) even if the lease terminated, whether Moore is entitled to continue to produce from forty acres around each well, 6) whether the trial court erred in denying Moore's counterclaim seeking recovery of his property and fixtures, 7) whether the trial court erred in awarding Jet Stream damages measured by gross oil sales when Moore continued to produce after notice from Jet Stream that the lease had terminated, and 8) whether the trial court erred in awarding damages to Jet Stream for underpayment of royalties. Although we affirm the majority of the trial court's judgment, we conclude the trial court erred in enjoining Moore from recovering his oilfield equipment, except the well casing, and erred in awarding Jet Stream damages, based on bad faith trespass, measured by gross oil sales. We modify the trial court's judgment, affirm in part the judgment as modified, and reverse and remand in part.

## I. The Railroad Commission Order Is Not a Force–Majeure Event

■ The trial court granted Jet Stream's motion for partial summary judgment, which argued the force-majeure provision does not apply where the cause of production is the result of lessee's failure to comply with the Texas Railroad Commission's regulations. To prevail on a traditional motion for summary judgment, a movant must establish that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex.1979); *Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377 (Tex.App.-Texarkana 1989, no writ). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Limestone Prods. Dist., Inc. v. McNamara*, 71 S.W.3d 308, 311 (Tex.2002); *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999).

■ An oil and gas lease "is not a 'lease' in the traditional sense of a lease of the surface of real property. In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex.2003) (footnotes omitted). When a lessee retains only a royalty interest, the lessee acquires title to "all of the oil and gas in place, and the lessor owns only a possibility of reverter and has the right to receive royalties." *Id.* The oil and gas lessee acquires ownership of all the minerals subject to the possibility of reversion to the lessor. *Id.* The lease in this case provides, in pertinent part, as follows:

2. Subject to the other provisions herein contained, this lease shall be for a term of Five years, from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land which said land is pooled hereunder.

. . . .

5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter. . . . If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but Lessee is then engaged in drilling or reworking operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in production of oil, gas or other mineral so long thereafter as oil, gas or other mineral is produced from said land.

Texas Railroad Commission rules require operators of oil and gas wells to post financial assurance for the purpose of making certain that oil and gas wells are properly capped when production from them ceases. Prior to 2002, the Commission permitted small operators, including Moore, to pay a $1,000.00 fine in lieu of providing this additional financial assurance. After the Railroad Commission announced it would require all operators to provide financial assurance, Moore contacted three insurance agencies and cover-

age was denied.[1] On May 28, 2002, Moore requested a hearing at the Railroad Commission on the issue. Moore's application for a hearing was denied November 14, 2003. While his request for a hearing was pending, Moore learned that a court-ordered temporary injunction had been issued prohibiting the Texas Railroad Commission from enforcing the rule changes. Shortly after Moore learned the litigation had been resolved in favor of the Texas Railroad Commission, the Commission ordered Moore to cease production for failure to post a "P–5 Certificate of Financial Assurance." Moore received the order, dated August 12, 2004, and on August 20, 2004, ceased operations. On August 24, 2004, Moore applied to a bank for an irrevocable letter of credit, which was denied several months later. Moore eventually obtained a letter of credit from another bank May 20, 2005. After rejecting the bank's letter of credit twice for errors of form, the Texas Railroad Commission accepted it as the required financial assurance July 15, 2005, and Moore resumed production. It is uncontested that Moore ceased production between August 20, 2004 and July 15, 2005—a period of almost eleven months.

 Because production was ceased pursuant to an order from the Texas Railroad Commission, Moore argues that the "force-majeure" clause contained in the lease precludes termination of the lease for nonproduction. A "force-majeure clause" is generally defined as a "contractual provision allocating the risk if performance becomes impossible or impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled." BLACK'S LAW DICTIONARY 674 (8th

---

1. Moore states in his summary judgment affidavit that coverage was denied due to insufficient liquid collateral and the lack of general liability insurance, which he had never been required to carry. According to Moore, "[i]n essence, I was rejected because I was too small an operator."

ed.2004). In the oil and gas context, the purpose of a force-majeure clause "is to excuse the lessee from non-performance of lease obligations when the non-performance is caused by circumstances beyond the reasonable control of the lessee ... or when non-performance is caused by an event which is unforeseeable at the time the parties entered the contract." *Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 435–36 (Tex. App.-Amarillo 1993, no writ) (citations omitted). When a lessee raises a force-majeure clause as an excuse for nonperformance, the lessee bears the burden of proof to establish that defense. *Id.*

The force-majeure clause in the lease [2] provides as follows:

11. All terms and express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules and Regulations, and this lease shall not be terminated, in whole or in part, nor Lessee held liable for damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation.

Moore claims the force-majeure clause excused the lack of production because the lease does not require the event must be beyond the control of the lessee. Jet Stream claims the force-majeure clause requires that the event be beyond the control of the lessee.

In *Frost National Bank v. Matthews*, this Court held that a force-majeure clause prevented the termination of a mineral lease when the production was ceased pursuant to a shut-in order by the Texas Railroad Commission. 713 S.W.2d 365, 367 (Tex.App.-Texarkana 1986, writ ref'd n.r.e.). *Frost National Bank*, though, is distinguishable from the current case. First, as noted by the Corpus Christi Court of Appeals in *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 241 (Tex.App.-Corpus Christi 1994, writ denied), the order was not within the reasonable control of the current operator. The shut-in order was based on over-production by a prior operator. *Frost Nat'l Bank*, 713 S.W.2d at 367. Second, this Court also relied on the fact that shut-in royalties were paid. *Id.* In the current case, Moore does not allege shut-in royalties, or other rental payments, were available under the lease or that they were paid.

Moore's argument is based on the analysis utilized by the Amarillo Court of Appeals in *Sun Operating Ltd. Partnership v. Holt*, 984 S.W.2d 277 (Tex.App.-Amarillo 1998, writ denied). The court held "when the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *Id.* at 283 (citing *Hydrocarbon Mgmt.*, 861 S.W.2d at 436; *Tex. City Ref., Inc. v. Conoco, Inc.*, 767 S.W.2d 183, 186 (Tex.App.-Houston [14th Dist.] 1989, writ denied), *disapproved on other grounds by Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 757 (Tex.1993) (venue)). The force-majeure clause will be interpreted based on the plain, ordinary, and generally accepted meaning of the language. *Id.* at 288. Although the court in *Holt* found the event must be beyond the reasonable control of the lessee, the conclusion was based on the language of the lease. *Id.* Moore argues that, since the language of the lease does

---

**2.** Of the numerous copies of the lease introduced into the record, none of the copies contains a complete legible copy of the statement at issue. This quotation is the product of combining two incomplete copies of the lease. We emphasize that the parties should make sure the record accurately reflects the entire document at issue—particularly the clauses being disputed.

not specify that the event must be beyond his reasonable control, the lease does not contain such a requirement.

We disagree that the language of the lease does not require the event to be beyond the control of the lessee. The clause provides "this lease shall not be terminated ... for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation." As such, the lease requires compliance to be "prevented by" or "the result of, any such Law, Order, Rule or Regulation." If the regulation is within the control of the lessee, compliance is not prevented or the result of the regulation. Here, the requirement that Moore post security did not compel the termination of production, but imposed conditions for all producers to comply with in order to continue production.

When construing a lease similar to the lease in this case, the Corpus Christi Court of Appeals reached a similar conclusion. *See Albrecht,* 878 S.W.2d 236. Similar to this lease, the lease did not contain the phrase "beyond the reasonable control of the lessee." *See id.* at 242. Because the operator had failed to comply with its regulations, the Railroad Commission ordered a well shut-in. *Id.* at 236. The court held the force-majeure clause was not triggered because the compliance was within the reasonable control of the lessee. *Id.*

When construing a force-majeure clause identical to the clause in this case, the Tenth Circuit has concluded the "governmental regulation at issue must preclude a lessee from performing the sought-after relief." *Watts v. Atl. Richfield Co.,* 115 F.3d 785, 796 (10th Cir.1997). The court reasoned that "[m]ere compliance with a governmental regulation" would not satisfy the force-majeure clause. *Id.* Because the lessee could have complied with the regulation at issue and still have protected

the unit from drainage, the court held the force-majeure clause did not protect the lessee. *Id.*

Jet Stream introduced summary judgment evidence that other producers in the area were able to comply with the financial assurance regulation. In his summary judgment affidavit, William L. Rudd, III, states he was able to comply with the financial assurance regulation and "[o]ther operators of the size of T & M Production were able to obtain financial assurance without a problem." Once the movant establishes that it is entitled to summary judgment, the burden shifts to the nonmovant to show why summary judgment should not be granted. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989). In his summary judgment affidavit, Moore states he requested a hearing in 2002 "because bonds were for all practical purposes not available." Even if this is some evidence that bonds were not available in 2002, this statement is not evidence that bonds were unavailable in 2004. Further, the financial assurance was not required to be a bond. Ultimately, Moore obtained a letter of credit from a bank rather than obtaining a bond. The statement does not indicate whether forms of financial assurance, other than bonds, were available. Moore also introduced numerous articles from *The American Oil & Gas Reporter.* Moore claims these articles create a fact issue. While the articles discuss that many small operators were unable to comply with the financial assurance requirements, the articles also state that some operators were able to comply with the regulations. Thus, Moore's own summary judgment evidence establishes at least some forms of financial assurance were available. The summary judgment evidence conclusively established forms of financial assurance were available.

As noted by the Fifth Circuit: "[i]f a contractor were able to escape his responsibilities merely by causing an excusing event to occur, he would have no effective 'obligation to perform.'" *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1540 (5th Cir.1984) (whether force-majeure clause in contract to deliver oil applied due to restrictions imposed by Libya). Because the evidence conclusively established forms of financial assurance were available, the Texas Railroad Commission's regulation requiring financial assurance did not preclude compliance with the lease. Similar to *Watts*, the regulation was not a force-majeure event. The trial court did not err in granting Jet Stream's motion for partial summary judgment on this issue.

## II. Due Diligence Was Not an Issue Under the Force–Majeure Clause

 Moore argues there is a fact issue concerning whether he was diligent in obtaining the financial assurance requirements.[3] While due diligence is required for certain provisions of oil and gas leases such as the implied covenant of reasonable development, due diligence is not an issue when deciding whether a force-majeure clause applies. Unless the lease provides otherwise, Texas law is well established

that due diligence is not required under force-majeure clauses. *See Holt*, 984 S.W.2d at 283. Further, Moore did not argue there was a fact issue on diligence to the trial court. In his motion for summary judgment, Moore argued there were no genuine issues of material fact concerning the force-majeure clause. This issue is not preserved for appellate review. *See* TEX. R.APP. P. 33.1. We overrule Moore's second point.

## III. Production on the N.B. Perry Survey Did Not Hold the Lease

 Moore claims, in his third point of error, that there was production on the 1533.27 acres originally leased under the 1943 lease. The evidence conclusively established that at least one well was producing in the N.B. Perry Survey. The entire N.B. Perry Survey was among the property included in the original 1533.27 acres covered by the lease. However, Rudd testified these wells were released in 1954 from the 1943 lease.[4] For the sake of convenience, we will refer to the land released from the 1943 lease as the Perry Tract and refer to the remainder of the land under the 1943 lease as the Rudd Tract.

---

3. Moore argues in his brief: "[i]f Appellant is not entitled to defend Appellee's suit under the force majeure clause as argument in Issue No. 1 above under the theory that he was diligent in meeting the financial assurance requirements of the Railroad Commission, then he is entitled to a trial on that issue." Moore concludes the argument with the assertion that "[i]f his diligence is an issue, Appellant should be able to try this issue and summary judgment should be deemed inappropriate because of this fact." If Moore is raising the issue of due diligence in the context of a defense other than the force-majeure clause, Moore's brief fails to specify what defense is being argued. To the extent this argument can be interpreted as raising a defense other than the force-majeure clause, the argument is inadequately briefed. *See* TEX.

R.APP. P. 38.1(h). Further, Moore has failed to preserve any other defenses by raising them in the trial court. *See* TEX.R.APP. P. 33.1.

4. The record contains a release dated April 1, 1952, from Phillips Petroleum Company in which Phillips surrenders all interest in the Perry Tract. The parties have not directed us to where the record contains evidence of how Phillips obtained its interest under the lease. To the extent the best evidence rule would require the introduction of the writing proving Phillips' interest, Moore waived any error by failing to object in the trial court. *See* TEX.R.APP. P. 33.1; TEX.R. EVID. 1002. Moore did not introduce any evidence contradicting Rudd's testimony.

Moore claims that the production on the Perry Tract prevented the lease from terminating. The Texas Supreme Court has disagreed. In *Ridge Oil*, the Texas Supreme Court held that production on the Ridge Tract did not hold the lease on the Guinn Tract after the lease had terminated as to the Ridge Tract. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 153 (Tex.2004). Both tracts had previously been covered by the same 1937 lease. *Id.* However, when the parties executed a new lease for the Ridge tract, the 1937 lease effectively terminated for the Ridge Tract. *Id.* After the lease terminated, the Texas Supreme Court held the production on the Ridge Tract no longer held the lease for the Guinn Tract. Similarly, the release of the Perry Tract from the lease terminated the lease as to the Perry Tract. As such, production on the Perry Tract did not hold the lease as to the Rudd Tract.

 Moore argues that the language of the lease requires all production to cease on all the property originally leased in 1943. In essence, Moore argues the fact that some of the acreage had been released from the lease is irrelevant. Moore directs us to two provisions in the lease:

2. Subject to the other provisions herein contained, this lease shall be for a term of Five years, from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land which said land is pooled hereunder.

. . . .

8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns of the parties hereto, but no change or division in ownership of the land, rental or royalties however accomplished shall operate to enlarge the obligations or diminish the rights of lessee; and no such change in ownership shall be binding on lessee nor impair the effectiveness of any payments made hereunder until lessee shall have been furnished, forty-five (45) days before payment is due, a certified copy recorded instrument evidencing any transfer, inheritance, sale, or other change in ownership. In the event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners, hereunder. If six or more parties other than the original lessor become entitled to royalty hereunder, lessee may withhold payment of royalty to such parties unless and until furnished with a recordable instrument executed by all of such parties designating an agent to receive payment for all.

According to Moore, the above provisions of the lease preclude the lease from terminating because production occurred on a tract of land described in the lease even though the tract upon which production had continued had been released from the lease.

Moore argues, because the lease provides "no change or division in ownership of the land, rental or royalties however accomplished shall operate to enlarge the obligations or diminish the rights of lessee," the release from the lease of the only producing tract is not relevant. The second provision, contained in paragraph 8, appears to be an entirety clause. An entirety clause is intended "to preserve the lease as an indivisible operating unit despite transfers of title by the lessor." 4 KUNTZ, THE LAW OF OIL & GAS, § 48.2, p. 144 (1990); 4–6 WILLIAMS & MEYERS, OIL & GAS

Law § 678 (Lexis 2006). The clause in paragraph 8 references changes in rental payments and royalties based on assignments or other changes in ownership. It specifically provides "rentals payable hereunder shall be apportionable." One of the purposes of an entirety clause is to relieve the parties of the obligations of the nonapportionment rule. 4 Kuntz, The Law of Oil & Gas, § 48.2, p. 144. The nonapportionment rule provides that royalty payments will only be paid to the extent of the lessor's interest in the tract where the well is located. *Id.* at p. 145. The nonapportionment rule may cause a lessor to duplicate equipment and require a lessor to protect against internal drainage, i.e., drainage from another subdivided portion of the same leased premises. *Id.* at pp. 144–46.

Paragraph 8 only prohibits changes in ownership under the lease from enlarging the obligations or diminishing the rights of the lessee; it does not apply to tracts of land which have been released from the lease. Moore ignores the beginning phrase of the paragraph which provides "[t]he rights of either party hereunder." The use of the word "hereunder" implies the clause only applies to tracts of land to which the lease applies. The rest of the paragraph indicates such a conclusion was the intent of the parties. The rest of the paragraph contains the following phrases: "payments made hereunder," "assignment of this lease," and "other leasehold owners hereunder." We conclude the intent of the parties was for the paragraph to only apply to tracts of land still bound by the lease. Therefore, the prohibition in paragraph 8 does not apply to changes of ownership of tracts which have been released from the lease.

■ The first provision, contained in paragraph 2 of the lease, merely references the land without any qualification for whether the acreage had been released from the lease. Thus, Moore argues production on land described in the lease will hold the lease regardless of whether the lease still applies to the property. The lessor is permitted, under the lease, to release tracts of land from the lease. The lease provides:

4. . . . Lessee, or any assignee hereunder, may at any time execute and deliver to lessor, or to the depository above named, or place of record, a release or releases covering any portion or portions of the premises held by him, and thereby surrender this lease as to such portion or portions, and thereafter the rentals payable by him shall be reduced proportionately.

When construing a lease, we must examine the entire lease and attempt to harmonize all its provisions. *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex.2002); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). When the clauses are read together, the intent of the parties was for "said land" to refer to land subject to this lease. Because the Perry Tract was released from the lease, it was no longer land subject to the lease. As such, the phrase "said land" does not refer to the Perry Tract.

Moore cites *Mathews v. Sun Oil Co.* for the proposition that, when an oil and gas lease covers land consisting of multiple tracts, production on one tract will operate to perpetuate the lease as to all tracts. 425 S.W.2d 330, 333 (Tex.1968). The present case, though, is distinguishable. While the lease in dispute covers multiple tracts, the only tracts on which there was production have been previously released from the lease.

In addition, Moore cites *Ridge Oil Co.* for the proposition that an oil and gas lease does not terminate when there are multiple operators under a lease and there

is production by only one operator. 148 S.W.3d at 149–50. As discussed above, the Texas Supreme Court in *Ridge Oil* ultimately held production on the Ridge Tract did not hold the Guinn Tract. *Id.* at 153. We note the Texas Supreme Court did hold, when there are multiple operators under a lease and there is production by only one operator, the production holds the lease. *Id.* However, this holding required both the nonproducing operator and the producing operator to be assignees of the same lease. That is not the situation we have in this case. In this case, the evidence shows the producing operator was a lessee under a different lease.

▌ Finally, Moore argues the lease has been pooled. Moore, though, has not directed this Court to where there is evidence of pooling of the Rudd Tract. Moore argues "production from the Haddad No. 1 Lease, which had been pooled with the acreage in the N.B. Perry Survey held his lease as shown by the Pooling Declaration and Agreement in the record." The record citations merely show that the Perry Tract was pooled. The fact that land which has been released from the lease has been pooled does not hold the lease. The record does not contain any evidence that any tracts which have not been released from the lease have been pooled with producing tracts. Moore's third point of error is overruled.

## IV. The Doctrine of Implied Temporary Cessation Does Not Apply

▌ In the alternative, Moore claims the implied temporary cessation doctrine precludes termination. Under the implied temporary cessation doctrine, a temporary cessation of production will not cause the lease to terminate and the lessee is entitled to a reasonable time in which to remedy the defect and resume production. *See Midwest Oil Corp. v.*

*Winsauer,* 159 Tex. 560, 323 S.W.2d 944, 946 (1959). The implied temporary cessation doctrine does not apply when a lease contains "a provision in the habendum clause which expresses a time limitation within which continued drilling or reworking operations must be conducted." *Holt,* 984 S.W.2d at 281–82; *Samano v. Sun Oil Co.,* 621 S.W.2d 580, 581–84 (Tex.1981); *Ridenour v. Herrington,* 47 S.W.3d 117, 120 (Tex.App.-Waco 2001, pet. denied).

Because the lease at issue contained explicit language limiting the cessation of production to a specific time period, the doctrine of implied temporary cessation does not apply.

## V. Moore Is Not Entitled to Forty Acres Around Each Well

In his fifth point of error, Moore claims he is entitled to forty acres around each of the two wells. The lease provides:

9. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by Texas Railroad Commission of the State of Texas, or any other State or Federal authority having control of such matters; or, in the absence of such rulings; forty (40) acres around each such well in as near a square form as practicable, and in the event lessor considers that operations are not being conducted in compliance with this contract, lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

Moore argues "[i]t is uncontraverted [sic] that Appellant was producing two wells on his lease at the time Appellees gave him notice that his lease had 'expired in accordance with its terms'" and claims he is entitled to retain forty acres around each well.

■ Moore argues, in a lease terminated due to nonproduction, there were producing wells. The key to this argument is that Moore defines a different date of termination than Jet Stream. If the lease terminated due to nonproduction, Moore assumes termination occurred when he received the notice of termination. Two wells were producing at the time Moore received the notice of termination sent by Jet Stream. Jet Stream asserts the date of termination was thirty days after the production ceased.[5]

■ The Texas Supreme Court and this Court have both held a lease, after the primary term has expired, automatically terminates after production is ceased. *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941) ("It appears to be very well settled that under the terms of the lease, upon cessation of production after termination of the primary term, the lease automatically terminated."); *Fuller v. Rainbow Res., Inc.*, 744 S.W.2d 232, 234 (Tex.App.-Texarkana 1987, no writ); *see Pool*, 124 S.W.3d at 203 ("under the automatic termination rule, without a savings clause, cessation of production in the secondary term automatically terminates the lease, even if profitable production is later

restored"); *Waggoner & Zeller Oil Co. v. Deike*, 508 S.W.2d 163, 166 (Tex.Civ.App.-Austin 1974, writ ref'd n.r.e.). Production of oil or gas constitutes a special limitation on the determinable fee transferred. *Id.* at 166. If drilling operations are not commenced within the specified time, the lease automatically terminates. *Id.* Because there is nothing a lessee could do to correct or begin to correct the breach of a special limitation, any notice provision does not apply. *Id.* The lease automatically terminated when production was not resumed within the specified time, and notice of termination was not required. At the time the lease automatically terminated, there were no producing wells.[6] As such, the clause does not apply. Moore's fifth point of error is overruled.

## VI. The Trial Court Erred In Issuing an Injunction Prohibiting Moore From Recovering His Equipment

In his sixth point of error, Moore argues the trial court erred in denying Moore's motion for summary judgment seeking recovery of his equipment still on the land, including the well casings. Moore had brought a counterclaim seeking a declaratory judgment that he had the right to remove his equipment, including the casings. Jet Stream failed to respond to this counterclaim in either his motion for partial summary judgment or in the brief in support thereof. After granting Jet Stream's motion for partial summary judgment and denying Moore's motion for sum-

---

**5.** We note paragraph 5 of the lease contains two specific time limits: a thirty-day provision and a sixty-day provision. Jet Stream argues the thirty-day limit applies. This opinion should not be interpreted as holding the thirty-day provision applies to the facts of this case. It is not necessary for us to decide which specific time limit applies because it is uncontested that production ceased for more than sixty days.

**6.** We note the Beaumont Court of Appeals has construed a similar provision and awarded the lessee forty acres around each producing well. *Hunt Oil Co. v. Dishman*, 352 S.W.2d 760 (Tex.Civ.App.-Beaumont 1961, writ ref'd n.r.e.). *Hunt Oil*, though, is clearly distinguishable from the current case. In *Hunt Oil*, the lease was not terminated for lack of production and there were wells producing when the lease terminated. *Id.*

mary judgment, the trial court set the case for trial.

■ In his answer and counterclaim, Moore pled that, in the event the lease terminated, he had "the right at any time during or after the expiration of this Lease to remove all property and fixtures placed by lessee on said land, including the right to draw and remove all casing on the property." This issue was not disposed by the partial summary judgment. Although not listed among the issues set for trial, the record indicates the trial was intended to resolve all remaining issues.[7] Moore was afforded the opportunity to present evidence at the trial, and Jet Stream cross-examined Moore concerning his testimony. Neither party argues the trial court's judgment was not final or complains that this issue was not among those set for trial. The final judgment disposes of all parties and all claims. A judgment that disposes of all parties and all claims is final and appealable. *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191 (Tex.2001). The trial court's judgment is a final, appealable order.

At the hearing, Moore testified that the value of "all the equipment and casing" for the well sites would be approximately $100,000.00. In its final judgment, the trial court issued a permanent injunction enjoining Moore from "taking any action to interfere with the current status of the wells ... including specifically taking any action to remove equipment from the wells or otherwise changing the current status of the well pending further order of this court."

Jet Stream argues Moore is currently in possession of the fixtures, the issue is not ripe, and a party cannot appeal the denial

of a summary judgment. First, there is no evidence in the record concerning who is in possession of the equipment. Second, Jet Stream fails to cite any authority for the proposition the issue is not ripe for adjudication and as such the issue of ripeness is inadequately briefed. *See* TEX.R.APP. P. 38.1(h). Thus, the only argument advanced by Jet Stream that merits attention is whether an appellant can appeal the denial of a motion for summary judgment.

■ Where a motion for summary judgment is denied by the trial court and the case is tried on its merits, the order denying the summary judgment cannot be reviewed on appeal. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex.1966); *Williams v. Colthurst*, 253 S.W.3d 353 (Tex.App.-Eastland 2008, no pet.); *Cleaver v. Cundiff*, 203 S.W.3d 373, 379 (Tex.App.-Eastland 2006, pet. denied); *Anderton v. Schindler*, 154 S.W.3d 928, 931 (Tex.App.-Dallas 2005, no pet.); *see Valencia v. Garza*, 765 S.W.2d 893 (Tex.App.-San Antonio 1989, no writ). Because Moore cannot appeal the denial of his summary judgment motion, we will, in the interest of justice, interpret Moore's sixth point of error as challenging the trial court's permanent injunction.

■ The lease in this case provides the "[l]essee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by lessee on said land, including the right to draw and remove all casings." An operator has an implied right to remove leasehold equipment "within a reasonable time of the expiration of the lease, even in the absence of a specific provision authorizing such removal." *McCormick v. Krueger*, 593 S.W.2d 729, 731 (Tex.Civ.

---

7. Jet Stream did not object when Moore presented evidence concerning the value of the oilfield equipment. In its brief, Jet Stream alleges this issue was set for trial on the merits.

App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.); *cf. Exxon Corp. v. Pluff,* 94 S.W.3d 22, 30 (Tex.App.-Tyler 2002, pet. denied) (no implied duty to remove equipment). Leasehold equipment is considered personal property. *See id.; Meers v. Frick–Reid Supply Corp.,* 127 S.W.2d 493, 496 (Tex.Civ.App.-Amarillo 1939, writ dism'd); *Orfic Gasoline Prod. Co. v. Herring,* 273 S.W. 944, 945 (Tex.Civ.App.-Waco 1925, no writ). We note, though, the lessee does not have the right to remove the well casing if the well is producing or the removal would damage the well. *See Patton v. Rogers,* 417 S.W.2d 470, 478 (Tex.Civ.App.-San Antonio 1967, writ ref'd n.r.e.) ("an owner has no right to remove casing from a producing oil and gas well"); *Eubank v. Twin Mountain Oil Corp.,* 406 S.W.2d 789, 791 (Tex.Civ.App.-Eastland 1966, writ ref'd n.r.e.). "Where the owner of the casing is precluded by the principle of equity ... from removing the casings from a well producing or capable of producing products in paying quantities, he is, nevertheless, entitled to just compensation measured by the value of such casing in place less the cost of removing the same." *Fike v. Riddle,* 677 S.W.2d 722, 727 (Tex. App.-Tyler 1984, no writ).

Moore had the right to recover his equipment except the well casing. Moore was also entitled to the value of the well casing less the cost of removal. Moore testified that the value of "all of the equipment and casing" for the well sites would be approximately $100,000.00. This is some evidence of the total value of all of the equipment and the well casing. However, the record contains no evidence of the cost of removing the well casing. Because it was Moore's burden to introduce evidence of both the value of the well

casing and the cost of its removal, the trial court did not err in failing to enter a finding of damages for the casing. Except for the well casing, the trial court erred in enjoining Moore from removing his equipment from the lease property.

## VII. The Trial Court Erred in Awarding Gross Revenue

In his seventh point of error, Moore argues the trial court erred when it awarded Jet Stream damages measured by the gross revenue from oil sales after Moore resumed production in 2005. On rehearing, Moore directs this Court to Jet Stream's request in its petition that a temporary injunction be issued prohibiting Moore from ceasing production during the pendency of the proceedings. Moore argues Jet Stream should be estopped from collecting damages for bad faith trespass and should be limited to damages for good faith trespass.[8]

When a producer trespasses and extracts oil, gas, or other minerals, the method by which damages are calculated depends on whether the producer's actions are in good faith. If a producer trespasses in good faith, the measure of damages is the value of the minerals minus drilling and operating costs. *Mayfield v. de Benavides,* 693 S.W.2d 500, 506 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.); *see Bender v. Brooks,* 103 Tex. 329, 335, 127 S.W. 168, 171 (1910). "To be in good faith in developing a tract of land for oil or gas, one must have both an honest and a reasonable belief in the superiority of one's title." *Mayfield,* 693 S.W.2d at 504; *Gulf Prod. Co. v. Spear,* 125 Tex. 530, 84 S.W.2d 452, 457 (1935). The measure of damages for bad faith trespass, though, is " 'the value of the things mined at the time of sever-

8. Moore presented the estoppel theory to the trial court in his arguments in support of his motion for new trial.

ance without making deduction for the cost of labor and other expenses incurred in committing the wrongful act . . . or for any value he may have added to the mineral by his labor.'" *Mayfield*, 693 S.W.2d at 506 (quoting *Cage Bros. v. Whiteman*, 139 Tex. 522, 163 S.W.2d 638, 642 (1942)). The measure of damages for bad faith trespass is intended to both compensate the owner and to punish the trespasser. 1 KUNTZ, THE LAW OF OIL & GAS, § 11.3, p. 309 (1987).

 In our original opinion, we concluded the trial court did not err in awarding damages based on a bad faith trespass because it was uncontested Moore extracted the oil with full knowledge of an adverse claim.[9] After reconsideration, we conclude the facts that Jet Stream—1) affirmatively requested production not be suspended, and 2) agreed to the temporary injunction—should estop Jet Stream from obtaining damages based on bad faith trespass.

Jet Stream denies, in its response to Moore's motion for rehearing, that it requested Moore be temporarily enjoined from ceasing production. According to Jet Stream, the agreed temporary injunction represented "a compromise as to the scope of the injunctive relief granted, specifically denying the relief requested by Appellees that Appellant not be permitted to continue production."[10] Jet Stream directs us to language in the petition that Moore be enjoined from "continuing to produce the property. . . ." This language, however, is contained in paragraph VIII of Jet Stream's original petition which requests a permanent injunction.[11] Paragraph IX of Jet Stream's original petition provides as follows, in pertinent part:

> Defendant should be cited to appear and show cause why he or it should not be *temporarily restrained*, during the pendency of this action, *from shutting in production of oil, gas or other minerals from the Property*, from removing the equipment or plugging the Wells located on the Property, from accepting the proceeds of sale for gas produced from the Property from any third party, and upon hearing, why a receiver should not be appointed to operate the Wells.

(Emphasis added.) As demonstrated by the quoted language, Jet Stream affirmatively requested in its original petition that production continue.[12]

We note the Austin Court of Appeals has held a party cannot rely on a temporary injunction as evidence of good faith

---

9. "When one enters into possession of land and makes improvements thereon with full knowledge of the pendency of an action to enforce an adverse claim to the premises, one is conclusively considered a trespasser in bad faith." *Mayfield*, 693 S.W.2d at 504; *see Houston Prod. Co. v. Mecom Oil Co.*, 62 S.W.2d 75 (Tex. Comm'n App.1933); *NRG Exploration, Inc. v. Rauch*, 905 S.W.2d 405, 410 (Tex.App.-Austin 1995, writ denied). *But see Byrom v. Pendley*, 717 S.W.2d 602, 604 (Tex.1986) (no bad faith trespass when cotenant leases mineral rights).

10. Jet Stream claims the "agreement was that Appellant Moore is permitted to continue production, and the prevailing party to the litigation recovers the proceeds of production." This argument, though, would require us to go outside the record for facts not in evidence. This we decline to do.

11. We note the relevant language in Jet Stream's amended petition is identical to Jet Stream's original petition. Because the issue here is what position Jet Stream successfully requested, we will refer to the original petition rather than the amended petition.

12. We note Jet Stream requested that a receiver be appointed to operate the wells. While this is evidence that Jet Stream did not desire Moore to continue production, it indicates a desire not to cease production. Further, as noted above, Jet Stream agreed to a temporary injunction requiring Moore to continue production.

because a temporary injunction is merely intended to preserve the status quo. *Rauch*, 905 S.W.2d at 410. We agree with the Austin court that most temporary injunctions will not be evidence of good faith. This case, however, is distinguishable from *Rauch*. The temporary injunction in *Rauch* was not an agreed temporary injunction, and there is no indication that the mineral owner affirmatively requested the operator be temporarily enjoined from ceasing production. In this case, Jet Stream affirmatively requested production to continue in its original petition and agreed to a temporary injunction which was signed several months later. In the temporary injunction, Jet Stream agreed "the Defendant is required to continue to operate the wells as has been operated in the past without any discontinuation of production."

 Moore does not specify which form of estoppel should apply in this case. We conclude quasi-estoppel is most applicable here. The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed*, 22 S.W.3d 857, 864 (Tex.2000). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he or she acquiesced, or from which he or she accepted a benefit. *See id.; Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 367 n. 7 (Tex.App.-Texarkana 2002, pet. denied); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765–66 (Tex. App.-Texarkana 1992, writ denied). Jet Stream successfully requested that Moore be temporarily enjoined from ceasing pro-

duction and accepted the benefit of that position. As such, Jet Stream should be estopped from alleging Moore's conduct, which Jet Stream requested and benefitted from, was wrongful. Moore should not be punished for the conduct.

In its response, Jet Stream also argues Moore failed to present any evidence regarding the costs of production. Moore testified the costs of production account for approximately sixty percent of gross revenues. While Moore could have presented better evidence, Moore's testimony is more than a scintilla of evidence. There is some evidence of the value of the minerals minus drilling and operating costs.

Jet Stream affirmatively requested, in its petition and in the agreed temporary injunction, that production continue. As such, Jet Stream is estopped from seeking damages for bad faith trespass. Jet Stream's recovery should be limited to damages for good faith trespass—the value of the minerals minus drilling and operating costs. The trial court erred in awarding damages for bad faith trespass based on gross revenues.

## VIII. The Evidence Supporting the Award for Underpayment of Royalties Is Sufficient

 In his last point of error, Moore argues the only evidence concerning the underpayment of royalties is hearsay and the evidence is insufficient.[13] At trial, William L. Rudd, III, testified he calculated the underpayment of royalties from a review of the Texas Railroad Commission reports posted online. Rudd failed to testify how he made these calculations and

---

13. Although the record contains evidence that Moore accepted the reduced royalty payments and Moore complains that Jet Stream failed to introduce any of the division orders, Moore does not argue on appeal that Jet Stream is estopped from collecting underpayment of royalties. Moore's complaint on appeal is limited to challenging the evidence introduced by Jet Stream.

failed to provide the proper foundation for the online reports.

■■■■■ The admission and exclusion of evidence is committed to the trial court's sound discretion; thus, we review this issue under an abuse of discretion standard. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). Moore failed to object in the trial court to the evidence. In fact, Moore stated he had "no objection" to the evidence. Whether the trial court abused its discretion in admitting the hearsay is not preserved for appellate review. *See* Tex.R.App. P. 33.1.

■■■■■ Even if the evidence is hearsay, we can consider, in an evidentiary sufficiency review, hearsay evidence admitted without an objection.[14] *Wilson,* 168 S.W.3d at 812 n. 29; *see* Tex.R. Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay."). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Wilson,* 168 S.W.3d at 827. When conducting a factual sufficiency review, a court of appeals can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The evidence is more than a scintilla of evidence and the evidence is not controverted. The evidence is legally and factually sufficient.

## IX. Our Opinion Might Affect the Award of Attorney's Fees

■■■■■ On rehearing, Moore argues because he obtained some relief, "the award of attorney's fees for appeal should either be set aside or awarded to both Appellant and Appellee." Jet Stream requested and obtained attorney's fees under the Declaratory Judgments Act. Under Section 37.009, a trial court may award reasonable and necessary attorney's fees that are "equitable and just." Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (Vernon 2008). "A prevailing party in a declaratory judgment action is not entitled to attorney's fees simply as a matter of law; entitlement depends on what is equitable and just, and the trial court's power is, in that respect, discretionary." *Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist.,* 198 S.W.3d 300, 319 (Tex.App.-Texarkana 2006, pet. denied); *see Sharp v. Hobart Corp.,* 957 S.W.2d 650, 654 (Tex. App.-Austin 1997, no pet.). An award of attorney's fees under the Declaratory Judgments Act is not dependent on a finding that a party "substantially prevailed." *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 637 (Tex.1996); *see Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex.1998); *Flagship Hotel, Ltd. v. City of Galveston,* 117 S.W.3d 552, 566 (Tex.App.-Texarkana 2003, pet. denied). As such, the fact that Moore prevailed on two issues[15] does not

---

**14.** We note the Texas Supreme Court has stated, "[i]t has long been the rule in Texas that incompetent evidence is legally insufficient to support a judgment, even if admitted without objection." *City of Keller v. Wilson,* 168 S.W.3d 802, 812 & n. 29 (Tex.2005). On rehearing, Moore argues Rudd's testimony is incompetent because Rudd failed to introduce

"division orders or some title history of the royalties." Moore has failed to cite any authority that such a failure would render the testimony incompetent. *See* Tex.R.App. P. 38.1(h).

**15.** This Court has held the prevailing party is the party to the suit who successfully prosecutes the action or successfully defends

dictate that attorney's fees should be awarded.

 A reversal of the trial court's decision does not necessarily mean the award of attorney's fees was an abuse of discretion. *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.,* 128 S.W.3d 304, 324 (Tex.App.-Dallas 2004, no pet.). Although, under the facts of this case, the trial court's award would not be an abuse of discretion, the trial court might exercise its discretion differently in light of our opinion in this case. When a judgment is reversed on appeal, the reversal may affect whether the award of attorney's fees is equitable and just. *Id.; see also Barshop,* 925 S.W.2d at 637. "The trial court's decision whether to award attorney's fees in a declaratory judgment case depends on the court's conclusion whether it is just and equitable to do so under all the circumstances of the case...." *In re Estate of Kuykendall,* 206 S.W.3d 766, 772 (Tex.App.-Texarkana 2006, no pet.). Because our opinion on rehearing might affect the trial court's determination, we will remand the award of attorney's fees to the trial court for a determination of whether, in light of our opinion, the award is equitable and just.

**Conclusion**

We modify the trial court's judgment, affirm as modified in part, and reverse and remand in part. We reverse the award of damages for bad faith trespass and remand that portion of the case to the trial court for further proceedings consistent with this opinion. We also reverse the portion of the judgment awarding attorney's fees to Jet Stream and remand this portion of the case to the trial court for a determination of whether, in light of our

against it, prevailing on the main issue, even though not to the extent of its original contention. *Flagship Hotel,* 117 S.W.3d at 564.

opinion, an award of such fees to Jet Stream is "equitable and just." We modify the trial court's judgment to remove the permanent injunction prohibiting Moore from removing his equipment, with the exception of the well casing, from the lease property. As modified, we affirm the judgment of the trial court.

Moore is not the prevailing party because he did not prevail on the main issue—the termination of the lease.