

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00291-CV

———————————————

HICKS AIRFIELD PILOTS ASSOCIATION, Appellant

V.

HICKS ASSET PARTNERS, LLC, Appellee

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-292837-17

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

After Appellant Hicks Airfield Pilots Association (the Association) decided to reopen a vehicular entrance gate at Hicks Airfield (the Airfield), Appellee Hicks Asset Partners, LLC (HAP), which owns property at the Airfield, sued for declaratory and injunctive relief to stop it. After the close of evidence at a jury trial, the trial court granted a directed verdict for HAP on the basis that the Association's unilateral reopening of the gate would violate the Airfield's governing documents (the CCRs). The Association complains on appeal that the trial court erred in directing a verdict by (1) misinterpreting the CCRs, (2) awarding an injunction that exceeded the scope of that requested by HAP, and (3) awarding HAP its attorney's fees based on the court's misinterpretation of the CCRs. We will reverse the trial court's judgment in part and remand for proceedings consistent with this opinion.

## I. BACKGROUND

### A. THE CCRS

It is undisputed that the Airfield's CCRs govern this dispute. For our purposes, the CCRs consist of the original Declaration of Covenants, Conditions, and Restrictions; the Association's Bylaws; and the Fifth Amendment to the Declaration of Covenants, Conditions, and Restrictions. The CCRs delegate to the Association the "full power and authority" to enforce the CCRs and "to do all such things as are necessary, or deemed by the Association to be advisable, in order to preserve and

2

maintain Hicks Airfield, its runways, taxiways[,] and other [c]ommon [a]reas, as a private airfield for the benefit of the Owners."

All of the Airfield taxiways and roadways are part of the common areas and were conveyed to the Association through the Declaration. An easement was also created over all taxiways and roadways to "assure full and reasonable vehicular access and ingress and egress" to the Airfield:

> Declarant, its agents, customers and invitees, each Owner, and such other persons as may be designated by the Association from time to time, shall have an easement of ingress and egress for unrestricted vehicular and pedestrian access and ingress and egress to and from the [Airfield] and adjacent streets and roads, over the portions of the [Airfield] designated for use as the taxiway/roadway, subject to such reasonable Rules and Regulations as the Association may from time to time implement.

There was also reserved with the Association a "construction easement over and across all portions of the [Airfield] for the purpose of . . . making such repairs as may be the responsibility of, or permitted to be made by," the Association.

The Association is tasked with levying certain fees from the owners, including regular assessments and special group assessments. Among other items, these fees are to be used for the "improvement and maintenance of the [c]ommon [a]reas . . . and carrying out the various matters set forth or envisioned" in the CCRs. The amounts of the regular assessments are to be set "as the Association may determine to be necessary to pay the expenses of the Association (including reasonable reserves)." Special group assessments may be levied by the Association only if two-thirds of the

3

voting owners assent to them. These special assessments can be levied "for the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, unexpected repair[,] or replacement of any capital improvement upon the [c]ommon [a]reas."

Additionally, the Bylaws provide that

> [t]he omission or failure of the Association or any Owner to enforce the covenants, conditions, restrictions, easements, uses, limitations, obligations[,] or other provision of the Declaration, these By-Laws[,] or the regulations adopted pursuant thereto, shall not constitute or be deemed a waiver, modification[,] or release thereof, and the [Association] shall have the right to enforce the same thereafter.

Finally, central to this dispute is the Fifth Amendment to the Declaration (adopted in 1998),[1] which created new voting requirements for amending the CCRs:

> The consent of 60% of the then Owners of Lots . . . shall be required in order to amend this Declaration or change the covenants, conditions[,] and restrictions in whole or in part . . . provided, however, that the following amendments will require the approval of 90% of the then Owners of Lots . . . : (a) Any amendment which materially changes the use to be made of any portion of the Common Areas[.]

## B. FACTUAL BACKGROUND

The Airfield is a private airfield in Tarrant County comprised of approximately 270 privately owned lots, many of which contain airplane hangars. This dispute concerns a previously open entrance to the Airfield (the North Gate) that was closed

---

[1]It appears that the Fifth Amendment was the last time that the CCRs were amended.

in 2014. HAP owns Airfield Lot 61, which is directly adjacent to the North Gate. When open, the North Gate serves as an access point onto an airfield roadway (Aviator Drive) from Hicks-Avondale Road, a public roadway.[2] Aviator Drive runs directly in front of Lot 61.

Prior to the North Gate being closed in 2014, it contained a plastic arm gate that owners could open using a remote control for entrance onto the Airfield. But on a nearly daily basis, "unauthorized people"[3] or owners who did not have their remote controls would manually lift the arm gate, which rendered it inoperable. Spurred by safety concerns of unauthorized traffic on Airfield roadways and to quell the near-daily maintenance required to fix the gate, the Association decided to close the North Gate. The Association erected aluminum fencing over the entrance and placed plastic barriers in front of it. The issue of the North Gate closure was never put to a vote of the ownership, though there was disagreement at trial as to whether the closure was meant to be permanent or temporary. It was during the time that the North Gate was closed that HAP purchased Lot 61.

In 2016, discussions started about reopening the North Gate. These discussions were prompted primarily by lot owners who claimed that the North

---

[2]There is also a 30-foot emergency-access easement on Aviator Drive.

[3]Residents of nearby neighborhoods who were not owners of lots at the Airfield would often use the North Gate to enter the Airfield and use its roadways as a shortcut to another destination.

Gate's closure had created a traffic bottleneck at other Airfield entrances and along its roadways. The Association planned to install a more secure sliding-style gate at the entrance in hopes that it would hinder unauthorized traffic through the North Gate if and when it was reopened.[4] Again, no vote of the Airfield ownership was taken on the issue of reopening the North Gate. But the Association decided to reopen it without taking a vote.

Howard Cox, HAP's president, testified that he relied on the North Gate's remaining closed when he purchased Lot 61. He believed that the lot's value would decrease if the North Gate was reopened because it would increase traffic in front of this lot and crime throughout the Airfield. After learning about the proposed reopening of the North Gate, Cox repeatedly voiced his concerns to the Association, but the Association stood firm in its decision.

## C. PROCEDURAL HISTORY

In June 2017, HAP sued the Association for declaratory and injunctive relief to stop it from reopening the North Gate. It alleged in its petition that the reopening of

---

[4]The Association apparently purchased a new gate and was ready to install it at the North Gate before the trial court enjoined them from doing so. It is not clear from the record how the Association paid for the gate or how it planned to pay for its installation. It is also unclear whether the Association would need to levy a special assessment against the owners to pay for the installation, though a former president of the Association testified that the Association "probably had funds" available to pay for it. Regardless, there is no evidence in the record that the Association ever attempted to levy a special assessment—with or without the appropriate ownership approval—to defray the costs of reopening the North Gate.

the North Gate would constitute a material change to the Airfield's common areas and would also be a capital expenditure requiring a special assessment—both of which necessitate a consent vote of the Airfield's owners that the Association did not obtain. Specifically, HAP sought a judicial declaration that the proposed North Gate reopening "is a capital project which would require approval of the requisite percentage of the Hicks Airfield property owners and further that the required approval has neither been sought nor obtained." After the parties attended a failed mediation, the Association countersued for fraud, alleging that Cox and a former Association president had failed to disclose a real estate business relationship before engaging in court-ordered mediation in this case. The Association alleged that this "fraud by nondisclosure" materially affected the outcome of the mediation proceedings and caused the proceedings "to fail to achieve disposition of the matter."

The trial court temporarily enjoined the Association from reopening the North Gate, and the case proceeded to a jury trial. At trial, HAP moved for directed verdict on the grounds that the evidence established as a matter of law "that the gate was closed without membership approval of 90 percent as required by the governing documents of the [A]ssociation." It argued that this entitled HAP to a declaratory judgment that "until and unless there is an affirmative vote of 90 percent of the members of [the Association], the gate shall remain closed." The trial court granted HAP's motion for directed verdict.

In its Final Judgment and Permanent Injunction, the trial court stated that it had directed a verdict because the Association had "failed to comply with the [CCRs]" and "failed to produce any probative evidence supporting its fraud counterclaim." The trial court ordered that the Association be

> permanently restrained and enjoined from directly or indirectly modifying, constructing, repairing, removing, or in any way altering the existing roadway and closed gate and boundary fencing adjacent to [Lot 61] and further from directly or indirectly modifying, constructing, repairing, widening, extending, or in any way altering the common area of Hicks Airfield, including, specifically, Aviator Drive from the current north gate located on Aviator Drive to Hicks Avondale School Road . . . until and unless [the Association] has fully and expressly complied with all terms, conditions, and conditions precedent provided in the [CCRs], which expressly mandate, in relevant part, as follows: "provided, however, that the following amendments will require the approval of 90% of the then Owners of Lots . . . : (a) Any amendment which materially changes the use to be made of any portion of the *Common Areas*[.]"

The trial court awarded HAP interest, court costs, and attorney's fees pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, and it dismissed the Association's counterclaim with prejudice.[5]

## II. DISCUSSION

### A. THE TRIAL COURT ERRONEOUSLY CONSTRUED THE CCRs

In its first issue, the Association complains that the directed verdict for declaratory and injunctive relief rests on the trial court's misinterpretation that the CCRs require a 90% consent vote by Airfield lot owners before the North Gate can

---

[5]The Association has not appealed the trial court's dismissal of its counterclaim.

8

be reopened. The Association argues that the 90% voting provision from the Fifth Amendment applies only when the Association desires to amend the CCRs to materially change the use of the common areas. Thus, says the Association, because the CCRs currently require that the roadways and North Gate be used for ingress and egress to and from the Airfield, reopening the North Gate does not constitute a material change triggering the need to vote on an amendment to the CCRs.

HAP counters that a directed verdict was warranted because the undisputed evidence established that the Association never secured a 90% vote before moving to reopen the North Gate. According to HAP, this failure precludes the Association from reopening the North Gate because to do so would be a material change in the use of the common areas—namely, changing a closed gate to an open gate.[6] HAP also asserts that the evidence established that "the construction of an additional north entrance would have required the expenditure of significant capital."

We sustain the Association's first issue because (1) the CCRs unambiguously authorize it to maintain the common areas and easements and to ensure that the roadways be open for ingress and egress to and from the Airfield and (2) no other grounds support the directed verdict.

---

[6]HAP also argues that the Association waived its first issue because it failed to plead as an affirmative defense that the 90% voting provision was ambiguous. We disagree. The Association does *not* argue that the 90% provision was ambiguous. In fact, both parties seem to concede the opposite.

9

## 1. Standard of Review

Generally, we review a trial court's grant of a directed verdict for legal sufficiency of the evidence. *Byrd v. Delasancha*, 195 S.W.3d 834, 836 (Tex. App.—Dallas 2006, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 809–28 (Tex. 2005)). However, the trial court's interpretation of restrictive covenants is a legal question that we review de novo. *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowner's Ass'n, Inc.*, 178 S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet denied). We construe restrictive covenants by applying the general rules of contract construction. *Id.* at 391; *see Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998). A restrictive covenant should be liberally construed to give effect to its purpose and intent. Tex. Prop. Code Ann. § 202.003(a); *Buckner v. Lakes of Somerset Homeowner's Ass'n, Inc.*, 133 S.W.3d 294, 297 (Tex. App.—Fort Worth 2004, pet. denied).

"If the covenant has a definite or certain meaning, it is unambiguous as a matter of law." *Raman Chandler*, 178 S.W.3d at 391. Mere disagreement about the interpretation of a restrictive covenant does not render it ambiguous. *Buckner*, 133 S.W.3d at 297. "Words used in a restrictive covenant may not be enlarged, extended, stretched, or changed by construction, but will be given their commonly accepted meanings." *Id.*; *see Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 285 (Tex. 2018) ("No construction, no matter how liberal, can construe a property restriction into existence when the covenant is silent as to that limitation.").

Further, we "must affirm a trial court's directed verdict, regardless of the grounds asserted by the movant or upon which the trial court granted the directed verdict, if the record establishes any ground that entitles the movant to judgment as a matter of law." *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 191 (Tex. App.—Fort Worth 2004, pet. denied).

## 2. CCRs Authorize and Direct the Association to Maintain the North Gate as an Access Point

The CCRs unambiguously authorize the Association to maintain the North Gate as an open gate. They explicitly imbue the Association with "full power and authority to do all such things as are necessary" to "preserve and maintain" the Airfield's common areas—which include all roadways such as Aviator Drive—and to enforce the provisions of the CCRs. One such provision creates an easement "over all taxiways and roadways" to "assure full and reasonable vehicular access and ingress and egress . . . to and from [the Airfield] and adjacent streets and roads." There is a further easement reserved with the Association "over and across all portions" of the Airfield for the purpose of "making such repairs as may be the responsibility of" the Association.

These CCR provisions not only authorize the Association to maintain the North Gate as an open gate but also place upon it a duty to ensure that all of the roadways remain open for ingress and egress to and from the Airfield. Thus, it would

11

not be a violation of these CCR provisions for the Association to reopen the North Gate and install a new sliding gate without first putting it to a vote of the ownership.

HAP effectively argues that the Association's unilateral closing of the North Gate in 2014 served to amend the CCRs by (1) materially changing the use of the North Gate from an open gate to a closed gate common area, (2) removing the access easements as to the North Gate, and (3) mandating that the Association maintain and enforce the North Gate as a closed gate. The argument continues that, because the CCRs were so amended to close the North Gate, that the Association cannot reopen the North Gate until it obtains a 90% consent vote pursuant to the Fifth Amendment. The trial court agreed with this interpretation of the CCRs and enjoined the Association from reopening the North Gate until it secured a 90% vote of the owners to do so.

But this interpretation bypasses the principal question posed here: Does the Association have the power, pursuant to the existing CCRs, to maintain and enforce the North Gate as an open gate? For the reasons already explained, the answer to this question is unambiguously, "Yes." Even if we assume that the Association did not have the power to close the gate in 2014 without a vote, that improper closure did not serve to then amend the CCRs—both parties agree that no such amendment was ever formally enacted. And, the Bylaws explicitly provide that the Association's failure to enforce any provision of the CCRs cannot be deemed a waiver of the Association's right to later enforce that provision. Thus, the trial court's reading into the CCRs

12

such an amendment "construe[d] a property restriction into existence" that improperly limits the Association's authority on the issue. *Tarr*, 556 S.W.3d at 285. Accordingly, we hold that this interpretation cannot support the directed verdict.

### 3. No Other Grounds Support the Directed Verdict

Our inquiry does not end there, however, because we "must affirm a trial court's directed verdict, regardless of the grounds asserted by the movant or upon which the trial court granted the directed verdict, if the record establishes any ground that entitles the movant to judgment as a matter of law." *Westchester Fire Ins. Co.*, 152 S.W.3d at 191. There is only one additional ground raised in the record to potentially support the directed verdict: that the Association cannot reopen the North Gate because the expense of doing so would constitute a "capital improvement upon the [c]ommon [a]reas" that first requires a two-thirds vote of the ownership for the levying of a special assessment. But this ground cannot support the directed verdict because it does not present a live controversy ripe for declaratory or injunctive relief.

To be entitled to declaratory relief, the movant must present the court with a ripe controversy, and the declaration sought must actually resolve that controversy. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 685 (Tex. 2020). Likewise, "[a] trial court cannot grant injunctive relief based upon a hypothetical or contingent situation that might or might not arise at a later date." *Schroeder v. Rancho Escondido Cmty. Improvement Ass'n*, 248 S.W.3d 415, 417 (Tex. App.—Beaumont 2008, no pet.) (citing *Camarena v. Tex. Emp. Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988)).

13

The CCRs provide that the Association "may levy" a special assessment to defray the costs of a capital improvement if it first obtains a two-thirds vote of the ownership approving that assessment. But there is no evidence in the record that the Association ever attempted to levy a special assessment to defray the costs of reopening the North Gate. And if the Association has not attempted to levy a special assessment, HAP's argument related to what the Association must do in the event that it decides to levy a special assessment raises a purely hypothetical dispute that is not ripe for declaratory or injunctive relief.

Further, HAP's interpretation of the CCRs' special-assessment provisions is misguided. It essentially construes them to *require* the Association to levy a special assessment (with the proper ownership vote) when any potential project might constitute a capital improvement to the common areas. The plain language of the CCRs does not allow for such an interpretation and cannot sustain the trial court's directed verdict.

For these reasons, we sustain the Association's first issue and reverse the trial court's judgment insofar as it awarded declaratory and injunctive relief to HAP.[7]

---

[7]Because this holding also disposes of the Association's second issue—that the permanent injunction was beyond its allowable scope—we need not consider it. *See* Tex. R. App. P. 47.1.

14

## B. ATTORNEY'S FEES

In its third issue, the Association argues that the trial court erred in awarding HAP its attorney's fees because they were not equitable and just given the trial court's misinterpretation of the CCRs, or, alternatively, because they were not supported by sufficient evidence. We sustain the Association's third issue and reverse and remand as to the award of attorney's fees.

The trial court awarded HAP its attorney's fees pursuant to the Declaratory Judgments Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. Section 37.009 of the Act provides that a trial court may award "reasonable and necessary attorney's fees as are equitable and just." *Id.* It is within the trial court's discretion to decide what is equitable and just, and a party is not entitled to its attorney's fees based simply on whether it prevailed at trial. *Mitchell v. Ballard*, 420 S.W.3d 122, 134–35 (Tex. App.—Texarkana 2012, no pet.). Further, "[w]hen a judgment is reversed on appeal, the reversal may affect whether the award of attorney's fees is equitable and just." *Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 432 (Tex. App.—Texarkana 2008, pet. denied). Thus, a reversing court may remand the case back to the trial court to reconsider the award of attorney's fees in light of its decision. *Id.*

Because our opinion might affect the trial court's fee determination, we will reverse and remand the award of attorney's fees to the trial court for a determination of whether, in light of our opinion, the award is equitable and just. *See Mitchell*, 420 S.W.3d at 134.

## III. CONCLUSION

Having sustained the Association's first and third issues, we (1) reverse that portion of the trial court's judgment that awarded declaratory and injunctive relief to HAP and (2) reverse the award of attorney's fees and remand to the trial court for further proceedings consistent with this opinion.

/s/ Brian Walker

Brian Walker
Justice

Delivered: June 15, 2023