

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00106-CV
_____


JEFF MOORE, D/B/A T&M PRODUCTION, Appellant

V.

JET STREAM INVESTMENTS, LTD.,
SARA P. RUDD, EXECUTRIX OF THE ESTATE OF
J.B. RUDD, AND YOUNGBLOOD PROPERTIES, L.P., Appellees


On Appeal from the 71st Judicial District Court
Harrison County, Texas
Trial Court No. 05-1140


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In its inception, this case involved a dispute between Jeff Moore, d/b/a T&M Production (who had been the holder of the oil and leasehold estate of certain realty in Harrison County, Texas) and Jet Stream Investments, LTD, et al. (the holder of the interests which had been subject to the oil and gas lease), wherein it had been alleged that the oil and gas lease had terminated under the terms of the lease for want of production.[1]   The case was instituted and tried as an action for declaratory judgment.[2]   After a bench trial, the trial court awarded judgment in favor of Jet Stream, including damages in the amount of $94,752.54, plus attorney's fees.[3]   On appeal, this Court held,

---

[1]In *Moore v. Jet Stream Investments, LTD*, 261 S.W.3d 412 (Tex. App.—Texarkana 2008, pet. denied), this Court addressed Moore's appeal of the trial court's judgment declaring that an oil and gas lease had terminated due to nonproduction.   Moore operated the lease, which contained a five-year primary term and continued thereafter as long as oil or gas was produced.   On August 20, 2004, after Moore failed to comply with an order from the Texas Railroad Commission regarding posting financial assurance, the Commission ordered that he cease production.   Production did not resume until July 15, 2005.   Shortly after Moore resumed production, William L. Rudd, III, acting "[o]n behalf of the mineral owners," sent Moore a letter alleging the lease had terminated.   Jet Stream Investments thereafter brought suit seeking a declaratory judgment that the lease had terminated.   After granting Jet Stream's motion for partial summary judgment, the case proceeded to trial on the merits, with judgment rendered in favor of Jet Stream.

[2]We have pointed out in our recent case of *Ramsey v. Grizzle*, No. 06-09-00026-CV, 2010 WL 1980247 (Tex. App.—Texarkana May 19, 2010, no pet. h.), that such a controversy (i.e., whether a leasehold estate has reverted due to cessation of operations) is properly brought as an action in trespass to try title and not as an action for declaratory judgment.   Unlike the *Ramsey* case, no complaint of this nature was raised here and the issue would, therefore, be unassigned or unpreserved error which we cannot entertain.   TEX. R. APP. P. 33.1.   The Texas Supreme Court has allowed consideration of unassigned error only in cases wherein the jurisdiction of the appellate court is questionable and in cases involving quasi-criminal matters.   *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003).   This case fits into neither category and our previous opinion has become final.

[3]Of this amount, $85,521.11 represented revenue received by Moore from the termination of the lease, and $9,231.13 represented underpayment of royalty.

2

*inter alia*, that the trial court erred in awarding damages measured by gross revenue from oil sales, and determined that Jet Stream's recovery should be measured by net revenue from oil sales.[4]  As a result of that determination, while affirming the finding that the lease had terminated, we reversed the award of damages and remanded that portion of the case to the trial court for further proceedings consistent with our opinion that Jet Stream's recovery should be limited to damages for good-faith trespass (i.e., the value of the minerals produced minus drilling and operating costs).[5]

We further recognized that should the recovery by Jet Stream be substantially different when a different determination of the measure of damages is employed, this could also substantially impact the trial court's determination of the fairness of the attorney's fee award.  In this regard, Moore maintained that because he obtained some relief on rehearing before this Court, "the award of attorney's fees for appeal should either be set aside or awarded to both Appellant and Appellee."[6]  We recognized that under the facts of this case, even though the trial court's award of attorney's fees would not be an abuse of discretion, the trial court might choose to exercise its

---

[4]Damages measured by gross revenue from oil sales were based upon bad-faith trespass.  Because we determined that Moore's trespass was done in good faith, damages are appropriately measured by net revenue from oil sales.

[5]*Moore*, 261 S.W.3d at 430.

[6]*Id.* at 431.  Jet Stream requested and obtained attorney's fees under the Declaratory Judgments Act.  Under Section 37.009, a trial court may award reasonable and necessary attorney's fees that are "equitable and just."  TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008).  When a judgment is reversed on appeal, the reversal may affect whether the award of attorney's fees is equitable and just.  *Sava Gumarska in Kemijska Industria D.D. v. Advanced Polymer Scis., Inc*., 128 S.W.3d 304, 324 (Tex. App.—Dallas 2004, no pet.).

discretion differently in light of our opinion. *Moore*, 261 S.W.3d at 432. We, therefore, reversed that portion of the judgment awarding attorney's fees to Jet Stream and remanded that portion of the case to the trial court to determine whether, in light of our opinion, an award of such fees to Jet Stream is "equitable and just." *Id*.

Upon remand, the trial court conducted a trial on June 17, 2009, in which it heard evidence related solely to the issue of damages and attorney's fees, per this Court's mandate dated January 15, 2009. On July 7, 2009, the trial court wrote a letter to counsel for all litigants which outlined its findings with respect to damages and attorney's fees, in accord with the opinion of this Court. Thereafter, on August 4, 2009, Moore filed a motion to reopen the presentation of evidence, which motion was denied after hearing by the trial court. The final judgment upon remand, issued August 21, 2009, awarded Jet Stream damages in the amount of $50,847.16, representing the net value of the revenues produced.[7] The judgment further awarded attorney's fees to Jet Stream in the amount of $10,000.00 for fees incurred "in the pursuit of this cause" together with contingent attorney's fees on appeal.

## II.    ISSUES ON APPEAL

On appeal, Moore raises five issues, claiming that the trial court erred in the following respects:   (1) when it denied Moore's motion to reopen evidence to correct the market value of oil

---

[7]The judgment confirmed the previous award of underpaid royalty in the amount of $9,231.13, together with post-judgment interest from and after June 12, 2007.

4

produced; (2) when it failed to include the cost of a letter of credit (which was required by the Texas Railroad Commission (Commission) as a condition of resuming production) as a part of the operating costs to be deducted from gross revenues; (3) in its determination of the value of minerals produced; (4) in failing to give Moore credit on the judgment for sums previously paid to Jet Stream and for sums held in suspense by Plains Marketing; and (5) in failing to reform the final judgment on remand to reflect the award of attorney's fees as set forth in the trial court's July 7, 2007, letter to counsel.   We affirm the judgment of the trial court.

A.      **The Trial Court Appropriately Exercised Its Discretion in Denying Moore's Motion to Reopen the Evidence**

Moore maintains that he discovered, subsequent to the hearing, that the total gross revenue figure presented by Jet Stream at the hearing was incorrect.   While Moore concedes that twelve days prior to the hearing, Jet Stream produced the market value figures it relied upon at trial, he only realized the inaccuracy of those figures when he received records from Plains Marketing[8] subsequent to the hearing.

The primary purpose of the mandated hearing was to determine damages for a good-faith trespass—the value of the minerals minus drilling and operating costs.  *Id.* at 430.   Jet Stream offered evidence that the total gross revenue derived from oil production during the pertinent time period was $153,158.87.   Kenneth Frazier, an expert witness called by Jet Stream, testified that the information he employed to determine total gross revenue was obtained from the Commission.

---

[8]Plains Marketing purchased and marketed the oil from Moore's producing wells.

Frazier explained that the total figure represented the value of the oil that was actually produced, as opposed to the value of the oil actually sold. Said another way, "total gross revenue" represents the amount of production of oil from the well multiplied by a standard and recognized market value for oil.[9] Finally, Frazier testified that Moore did not receive the entire $153,158.87—the value of the oil produced—because oil produced from March 2008 through September 2008 remains in storage on location.

In his motion to reopen evidence and on appeal, Moore contends that the records from Plains Marketing, which reflect the purchase price of the oil sold to it, contradict the figures introduced at trial.[10] Moore claims the court erred in failing to reopen the evidence to permit the error in mineral value to be corrected.

In a bench trial, the trial court may permit either party to offer additional evidence at any time when it clearly appears to be necessary to the due administration of justice. TEX. R. CIV. P. 270; *In re Estate of Huff*, 15 S.W.3d 301, 308 (Tex. App.—Texarkana 2000, no pet.). A trial court's discretion to permit additional evidence "should be exercised liberally to allow both parties to fully present their case." *Ex parte Stiles*, 950 S.W.2d 444, 446 (Tex. App.—Waco 1997, no

---

[9]The total production figures were reported by Moore to the Commission.

[10]At the hearing on Moore's motion for new trial, Jim O'Bannon, a crude oil representative from Plains Marketing, testified that total production for this lease, including severance taxes, is valued at $146,730.00. When severance taxes are deducted, the mineral value is $139,962.90. These figures are based on records reflecting amounts that Plains Marketing paid for the oil it purchased. O'Bannon does not know what was actually produced; he knows what Plains Marketing purchased. However, Plains Marketing bought all of the production from the lease with the exception of what might have been in the tanks at the time of the hearing.

writ). We review a trial court's decision to permit additional evidence under an abuse of discretion standard. *In re J.A.H.*, 996 S.W.2d 933, 935 (Tex. App.—Waco 1999, no pet.). The test for abuse of discretion is whether the court acted without reference to guiding rules and principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). In deciding whether to permit additional evidence, a trial court may consider (1) whether the movant showed due diligence in obtaining the evidence; (2) whether the additional evidence is decisive; (3) whether reopening the evidence will cause undue delay; and (4) whether reopening the evidence will cause injustice. *Huff*, 15 S.W.3d at 308.

We now apply these factors to the facts of this case to determine if the trial court acted within its discretion in denying Moore's motion to reopen.

### (1) Due Diligence

The hearing concluded June 17, 2009. On July 7, 2009, the trial court wrote a letter to counsel advising of its ruling on the merits. Moore's motion to reopen the evidence was filed August 4, 2009. Moore contends that even though the motion was filed in August after trial in June, due diligence was exercised because he was not aware of the discrepancy in the evidence on mineral value until that time.

At the hearing in June, Moore made no attempt to present independent evidence of the value of the minerals which were produced or sold. Moreover, there is no contention that the evidence Moore sought to introduce via his motion to reopen was unavailable to him at the time of

7

trial. Indeed, it appears that this evidence was readily available to Moore prior to trial. Counsel for Moore was candid in advising the court at the motion to reopen that there was access to this evidence "all along." When asked about the availability of the records regarding mineral value, O'Bannon (the sponsoring witness of the evidence in question) confirmed that such records were available at the time of trial.[11] Likewise, Moore does not dispute the availability of that evidence at the time of trial.[12] Given these facts, we are compelled to conclude that there has been a failure to show diligence in attempting to produce the evidence in a timely fashion. Where the party seeking to reopen has not shown such diligence, a trial court does not abuse its discretion by refusing to reopen a case after evidence is closed. *McNamara v. Fulks*, 855 S.W.2d 782, 784 (Tex. App.—El Paso 1993, no writ).

---

[11]O'Bannon testified at the motion for new trial:

> Q [By Plaintiffs' Counsel] Okay. And so if this trial was held in June of 2009, had this -- had the Defendant wanted to obtain these records, he could have obtained this record and presented it; is that correct?
>
> A [By O'Bannon] Yes, sir.

[12]Moore testified at the motion for new trial:

> Q [By Plaintiffs' Counsel] Mr. Moore, is there one item of information that you're asking now for the Court to look at in making a determination of a new trial that wasn't available to you prior to our trial in June?
>
> A [By Moore] Probably not.

### (2) Decisive Evidence

Frazier testified that the value of the production for the pertinent time period was $153,158.87. This evidence was undisputed at trial.[13] O'Bannon testified at the hearing on motion for new trial that the value of the minerals it purchased (as opposed to the value of the minerals actually produced) was $146,730.22. This figure represents the value of the minerals purchased by Plains Marketing, while the value proffered by Frazier represents the value of total production. Moreover, there is no dispute that oil was produced, but not sold, between March and September 2008. The uncontroverted evidence admitted at trial reflects the value of minerals produced, but unsold, to be $6,859.50. The two sets of figures are easily reconciled, and the difference between the two essentially has to do with a value measured by minerals sold versus the value measured by minerals produced.[14] Evidence of the value of oil actually sold is not decisive because it does not represent the value of all of the minerals.[15]

---

[13]In fact, Moore confirmed that the figure of $153,158.87 represents the value of the minerals produced.

[14]To the extent Moore claims trial court error for failing to reopen the evidence for the purpose of showing the amount of severance taxes paid, we note that the request to reopen was not made for that purpose. However, we recognize that information regarding the amount of severance taxes paid was likewise available to Moore at the time of trial. The source of Moore's evidence is the same for both the production data and the severance taxes.

[15]In our previous opinion, the trial court was asked to determine the "value of the minerals" in order to subtract the costs of drilling and production. We did not limit the phrase "value of the minerals" to include only the value of those minerals actually sold. *Moore*, 261 S.W.3d at 430.

### (3) Undue Delay

Moore contends that reopening the record would not have caused undue delay because it was only a matter of presenting production figures into evidence. However, when one takes into account the protracted trial and appellate history of this case, the trial court could well have determined that further delay would be undesirable; the trial court was of the opinion that the matter had previously been subject to perhaps excessive delay between the date this Court issued its opinion and the hearing on remand.[16]

Further, although Moore indicated that all he wanted to do if he was allowed to reopen was introduce only a small amount of evidence, the trial court is obligated to permit both sides to fully develop the case if a reopening is allowed. *Huff*, 15 S.W.3d at 308. Therefore, there might have been a more lengthy presentation than Moore anticipated.

When weighed against the rather lengthy history of this case, any delay occasioned by the reopening of the evidence could easily be deemed less than desirable.

### (4) Injustice

We cannot say that the admission of the evidence proffered by Moore regarding the value of the minerals sold was necessary to the due administration of justice when one takes into account the fact that the record reflected the existence of competent evidence of the value of the minerals, in compliance with this Court's directive. We further observe that had the motion to reopen been

---

[16]Our opinion was issued in August 2008, and the hearing on remand took place in June 2009.

granted, Moore would have essentially been afforded the opportunity to retry his case, after having already been given the trial court's letter ruling. The trial court could reasonably conclude that Moore's desire to offer additional evidence was related to its letter ruling. Here, the interests of justice do not warrant a second bite at the apple.

When each of these factors is taken into account, the fact remains that Moore did not show diligence in attempting to produce the available evidence in a timely fashion. The interests of justice do not warrant a reopening of the evidence. The trial court did not abuse its discretion in denying Moore's request to reopen the evidence. *See McNamara*, 855 S.W.2d at 784. We overrule this point of error.

## B.    The Damage Award Was Supported by the Evidence

In his second point of error, Moore contends that the $2,000.00 cost for Moore to obtain a letter of credit should have been included as a part of the operating costs to be deducted from the value of the minerals in order to determine damages.[17] Moore further contends that certain additional expense items should have been included within the category of operating costs, including (1) pumping expenses of $1,500.00 per month;[18] (2) the cost of a pumper to check the well during the time the well was nonoperational; and (3) miscellaneous expenses of $4,989.91. Moore urges that a clear reading of the ruling of the trial court adopted all expenses Moore

---

[17]Moore was required by the Commission to obtain a $2,000.00 letter of credit in order to continue to operate the wells in question.

[18]We do not address this area of damage, as Moore concedes that this expense was included in the operating costs.

submitted, totaling $114,552.12 and that he is entitled to a credit against the value of the minerals in this amount. We disagree.

Neither Moore nor Jet Stream requested findings of fact and conclusions of law, and for reasons we will discuss later in this opinion, the trial court's letter to counsel of July 7, 2009, cannot be considered as such.

In the absence of formal findings of fact and conclusions of law, the trial court's judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Rosa's Café, Inc. v. Wilkerson*, 183 S.W.3d 482, 486 (Tex. App.—Eastland 2005, no pet.). The trial court's determination that the net value of revenues produced was $50,847.16 is supported by evidence.

At the June hearing, the uncontroverted evidence established that the value of minerals produced was $153,158.57. After mineral value was established, Moore introduced evidence of claimed operating costs totaling $114,552.12. Those costs included pumping expenses of $1,500.00 per month for thirty-seven months, $750.00 for one month, and $500.00 per month for nine months,[19] for total pumping expenses of $60,750.00. In addition, Moore presented evidence of the cost of the letter of credit, as well as those expenses categorized as "miscellaneous" in the amount of $4,989.91.[20]

---

[19]The latter two items represent the cost of a pumper to check the well during the time the well was nonoperational.

[20]Miscellaneous expenses were for cell phone and postage; cell phone expenses were not allocated on a per lease basis.

Frazier testified on behalf of Jet Stream that operating costs attributable to production totaled $69,011.71.[21] Of this amount, $22,200.00 represents pumping costs at a rate of $400.00 per month.[22] Frazier was also of the opinion that neither the expense related to the issuance of a letter of credit,[23] nor the miscellaneous expenses offered by Moore, were chargeable expenses of well operation.

In a nonjury trial or hearing, the trial court is the sole judge of the witness's credibility and the weight to be afforded the testimony. *Tate v. Commodore County Mut. Ins. Co.*, 767 S.W.2d 219, 224 (Tex. App.—Dallas 1989, writ denied). The trial court, as the fact-finder, has the right to accept or reject all or any part of any witness's testimony. *Griffin Indus., Inc. v. Honorable Thirteenth Court of Appeals*, 934 S.W.2d 349, 357 (Tex. 1996). The trial court may believe one witness and disbelieve others, and may resolve inconsistencies in any witness's testimony. *Id.* Accordingly, the court was free to base its decision upon the testimony offered by Jet Stream or by

---

[21]In making this calculation, Frazier utilized Moore's expense figures with respect to the following costs: (1) electric; (2) supplies; (3) record keeping; (4) well servicing; (5) general lease work; (6) chemicals; and (7) taxes and insurance.

[22]The difference in the parties' evidence on pumping expenses is $38,550.00.

[23]Moore contends that because the trial court issued an oral pronouncement from the bench (at the hearing on Moore's motion for new trial), it intended for Moore to recover the cost of the letter of credit, he is entitled to a credit for same. An oral pronouncement from the bench regarding a signed and filed judgment carries no weight in and of itself. The trial court had plenary jurisdiction to modify the judgment when such pronouncement was made. *See, e.g.*, *L.M. Healthcare, Inc. v. Childs*, 929 S.W.2d 442, 443 (Tex. 1996). A motion to modify judgment, the appropriate procedural vehicle for the relief requested, was not filed. TEX. R. CIV. P. 329b(g) ("A motion to modify, correct, or reform a judgment . . . , if filed, shall be filed and determined within the time prescribed by this rule for a motion for new trial and shall extend the trial court's plenary power . . . in the same manner as a motion for new trial.").

13

Moore or on a combination of all of the evidence introduced at trial. Here, the trial court's damage figure is supported by ample evidence.[24]

We further observe that in the absence of findings of fact and conclusions of law, a determination of the precise evidence upon which the judgment is based is mere speculation.

Because there is evidence to support the judgment rendered, we overrule this point of error.

**C.       The Trial Court Did Not Err in Determining the Value of the Minerals**

There are three mineral values at issue.   The first is the value of the oil produced, which was proven at trial to be $153,158.57.   The second value is that of the minerals actually sold, this being $146,730.00.   The final value (the one proposed by Moore on appeal to be determinative) is the value of the minerals sold, less severance taxes.   This value is $139,962.90.   Moore claims the trial court erred when it found the value of the oil produced to be $153,158.87.   We disagree.

First, and as previously discussed, the evidence introduced at trial supports the value of the oil produced as being $153,158.57.   In fact, this evidence was not controverted.   Moreover, while evidence supporting Moore's assertion of mineral value as $139,962.90 was introduced at the hearing on motion for new trial, no such evidence was introduced at trial.   Thus, the trial court

---

[24]For example, the trial court could have found that the value of the minerals produced—$153,158.57—minus the operating expenses offered by Jet Stream—$69,011.71—would have entitled Jet Stream to recover $84,146.86.   The award of the court—$50,847.16—being less than that amount, is supported by the evidence.   Likewise, the trial court could have determined that the cost of the letter of credit and the miscellaneous expenses were not properly chargeable as operating expenses, based on Frazier's testimony.   It may also have opted for inclusion of Moore's expenses with respect to pumping costs, in combination with a reduction of other expenses, as mentioned above.   We conclude that in each of these scenarios, the decision of the trial court with respect to the damages for good-faith trespass—the value of the minerals produced minus drilling and operating expenses—is supported by the evidence.

14

could not have erred in failing to find the mineral value to be an indeterminate number unsupported by the evidence.[25]  Moore does not claim on appeal that the trial court erred in overruling his motion for new trial.

Moreover, we perceive this argument to be somewhat disingenuous.  Jet Stream's trial exhibit 3 sets forth all of the information necessary to establish the value of the oil produced.  This exhibit provides the following information:

Oil (BBL)          Oil (BBL)

| DATE | Production (Source: Texas RRC Website - Ex. "A") | Disposition (Source: Texas RRC Website - Ex. "A") | Actual Cost Ex/ "C" and Avg. Annual/Monthly Oil Price (Source: EIA Website WTI - Ex. "B" (See Fn) | Revenue from Oil Sales |
|---|---|---|---|---|
| Aug.-05 | 278 | 176 | $62.49 | $10,998.77 |
| Sept.-05 | 151 | 290 | $63.00 | $18,268.84 |
| Oct.-05 | 153 | 143 | $59.89 | $8,563.56 |
| Nov.-05 | 152 | 162 | $56.00 | $9,072.49 |
| Dec.-05 | 103 | 103 | $56.77 | $5,846.80 |
| Jan.-06 | 86 | 86 | $62.99 | $5,416.71 |

---

[25]Moore maintains that at trial, he did not agree that the amounts listed on Jet Stream's exhibit three outlining mineral values were accurate.  He further contends that there was no expert testimony regarding the actual value of the oil produced.  This is incorrect.  Frazier created Jet Stream's exhibit 3, and explained in detail the basis for the numbers included on that exhibit.

15

| | | | | |
|---|---|---|---|---|
| Mar.-06 | 37 | 80 | $60.69 | $4,854.88 |
| May-06 | 127 | 178 | $68.48 | $12,188.73 |
| Jun.-06 | 71 | 88 | $60.28 | $5,304.90 |
| Aug.-06 | 95 | 99 | $70.37 | $6,966.23 |
| Sept.-06 | 136 | 134 | $61.81 | $8,282.00 |
| Jan.-07 | 59 | 119 | $52.32 | $6,225.72 |
| May-07 | 21 | 110 | $60.94 | $6,703.18 |
| Oct.-07 | 139 | 144 | $83.20 | $11,980.22 |
| Nov.-07 | 120 | 161 | $92.87 | $14,952.71 |
| Feb.-08 | 5 | 116 | $92.01 | $10,673.62 |
| Mar.-08 | 7 | 0 | $105.45 | $738.15 |
| Apr.-08 | 10 | 0 | $112.58 | $1,125.80 |
| May-08 | 12 | 0 | $125.40 | $1,504.80 |
| Jul.-08 | 9 | 0 | $133.37 | $1,200.33 |
| Sept.-08 | 22 | 0 | $104.11 | $2,290.42 |
| | | | | |

Total Gross Revenue since January 2005       $153,158.87

The information in Jet Stream's exhibit 3, as set forth in the referenced table, reflects gross revenue for total oil sold (disposed of) from August 2005 through February 2008. However, from March 2008 through September 2008, exhibit 3 reflects that fifty-three barrels of oil were

16

produced, but not sold. The value of this oil (produced, but not sold) totals—according to the average annual/monthly oil price[26]—$6,859.50.

On appeal, Moore claims the total value of the oil produced was $146,730.00.[27] Moore then claims that amounts paid for severance taxes should be deducted, to arrive at the value of the minerals less operating expenses. Moore's argument fails for two reasons. First, Moore's premise is incorrect; the evidence clearly establishes that the value of the oil produced was $153,158.87. Moreover, there is no evidence that the value of the oil produced was $146,730.00, as Moore contends. Moore testified that the value of oil sold through February 2008, as reflected on Jet Stream's exhibit 3, is correct. Further, Moore agreed that the amount of production listed on exhibit 3 for March 8 through September 8 is correct; in fact, this is a recapitulation of what Moore reported to the Commission. Even though he did not dispose of the oil produced from March 8 through September 8, Moore agreed that the value of minerals produced was $153,158.87 (due to the fact that some oil remained unsold at the time of trial).

This testimony directly contradicts Moore's position on appeal, i.e., that the value of the minerals produced amounts to only $146,730.22. In fact, Moore acknowledged that the value of the oil sold is $146,730.22. O'Bannon, the sponsoring witness of the evidence offered at the

---

[26]The average annual/monthly oil price is not in dispute.

[27]O'Bannon testified at the hearing on motion for new trial that the "lease net" is actually $139,962.90. The "gross value"—or taxable value— is the lease net amount of $139,962.90, plus severance taxes in the amount of $6,767.35, yielding a gross value of $146,730.00. Evidence regarding severance taxes was not before the trial court at the time of trial, and therefore cannot be considered on appeal. TEX. R. APP. P. 33.1.

motion for new trial, acknowledged that his numbers only represented the amount of oil purchased from Moore by Plains Marketing.[28] The only evidence of the value of the oil produced was that offered by Jet Stream and acknowledged by Moore to be correct.[29]

Moore's third appellate point cannot be sustained for the further reason that no evidence was introduced at trial reflecting the amount of severance taxes paid on this amount. Because no such evidence was before the trial court, such evidence cannot be considered on appeal. TEX. R. APP. P. 33.1.

We overrule this point of error.

---

[28]O'Bannon testified as follows:

> Q    [By Plaintiffs' Counsel]   Okay.   Now - - so if we wanted to know what the value of the production was that Plains Marketing purchased, you would agree that it's $146,730.22?
>
> A    [By O'Bannon]   Yes.
>
> Q    Okay.   And now, if there was other amounts that had been produced but has not yet been sold, you wouldn't have any records concerning those, would you?
>
> A    No, sir.
>
> Q    And of course, that would also have value - - if there were oil still in the tanks or if there was oil that wasn't purchased by Plains, those - - you would not have any record concerning that.
>
> A    That is correct.

[29]It is unclear whether Moore contends on appeal that the correct measure of mineral value is the value of the oil sold versus the value of the oil produced.   We conclude that the trial court correctly based its judgment on the value of the oil produced.

18

**D.    Sums Previously Paid and Currently Held in Suspense by Plains Marketing**

At the hearing on motion for new trial, O'Bannon testified that funds were held in suspense by Plains Marketing until further orders of the court. However, $6,106.04 of the funds which should have remained in suspense were actually paid out to Jet Stream for production between August 2005 and January 2007. Moore further claims the sum of $2,641.27 currently remains in suspense for production between January 2007 and the present. Moore contends that (1) he is entitled to receive a credit against the judgment for the payment to Jet Stream in the amount of $6,106.04 and (2) he is entitled to receive a credit against the judgment in the amount of $2,641.27, the amount which currently remains in suspense.

Moore testified at the hearing on motion for new trial that Jet Stream was previously paid $6,107.04 from production funds. With respect to the question of whether Moore is entitled to a credit against the judgment in this amount, we note that no such evidence was before the trial court at the time of trial. Evidence of production funds paid to Jet Stream was disclosed at the hearing on the motion for new trial. Additionally, the information contained on exhibit 1 (Plains Marketing Accounting Summary) and introduced at the hearing on motion for new trial was likewise not before the trial court at the time of the trial. The issue of whether Moore is entitled to a credit for past production paid to Jet Stream was raised solely in connection with Moore's motion for new trial, the denial of which has not been appealed. Because this issue has not been

19

preserved for appeal, we may not consider it. TEX. R. APP. P. 33.1. We, therefore, overrule this point of error.

Moore next contends that he is entitled to receive a credit against the judgment in the amount of $2,641.27, which currently remains in suspense. This issue is rendered moot by the judgment upon remand, which provides:

> IT IS FURTHER ORDERED, that any purchaser of production from the W.L. Rudd B Lease # 00831, upon this Judgment becoming final, is ordered to pay over to the Plaintiffs all amounts maintained in suspense, from said lease, to be applied to the Judgment.

We, therefore, do not address this issue, as it is moot.

**E.      Modification of the Judgment to Change the Attorney's Fee Award**

In his final point of error, Moore maintains that the judgment upon remand should be modified to change the attorney's fee award. We disagree.

The judgment upon remand provides, in part:

> IT IS FURTHER ORDERED, that Plaintiffs receive their reasonable and necessary attorney's fees in the amount of Ten Thousand and No/100 Dollars ($10,000.00), for the attorney's fees incurred in the pursuit of this cause, together with contingent amounts in the event of an unsuccessful appeal by the Defendant in the amount of Ten Thousand and No/Dollars ($10,000.00) if this Judgment is unsuccessfully appealed to the Court of Appeals; an additional Ten Thousand and No/100 Dollars ($10,000.00) if a Petition for Review is filed with the Supreme Court of Texas and is unsuccessful; and an additional Ten Thousand and No/Dollars ($10,000.00) if the Petition for Review is granted and the Supreme Court denies relief to the Defendant.

Moore relies on the letter ruling of the trial court of July 7, 2009, which states:

Concerning the issue of "equitable and just attorney fee," the following fees are award [sic] to Plaintiff as "equitable and just"

$10,000.00 as originally awarded for the Trial Level Disposition.

The "good faith trespass" finding reflected in the Appellate Opinion, however, raises concerns as to the "equitable and just" status for awarding Attorney Fees to the Plaintiffs on appeal a concern that is compounded by language in Plaintiff's Original and Amended Petition in the case at hand that ". . . *contingent amounts as attorney's fees in the event of unsuccessful appeals by the Defendant*." Based on the concerns stated the award of Contingent Attorney Fees on Appeal to the Plaintiff would not be "equitable and just." Appellate Attorney Fees shall be paid by the incurring parties.

The resolution of this issue depends, at least in part, upon the accurate characterization of the trial court's letter to counsel dated and filed on July 7, 2009. Accordingly, we will examine this communication to determine whether it can correctly be characterized as findings of fact and conclusions of law.[30]

Findings of fact and conclusions of law need not be in any particular form so long as they are in writing and be "filed with the Clerk and shall be part of the record." *Villa Nova Resort, Inc. v. State*, 711 S.W.2d 120, 124 (Tex. App.—Corpus Christi 1986, no writ); *see* TEX. R. CIV. P. 297. Thus, it is possible for findings of fact and conclusions of law to be contained in a trial court's letter to counsel if such a letter is filed of record. *Duddlesten v. Klemm*, No. 06-08-00106-CV,

---

[30]Moore does not explicitly claim the trial court's letter of July 2009 amounts to formal findings of fact and conclusions of law; however, the content of the letter is treated as controlling and, thus, we recognize an implicit reliance upon the authority of the letter as findings of fact and conclusions of law.

21

2009 WL 635153, at *2 (Tex. App.—Texarkana Mar. 13, 2009, no pet.) (mem. op.). Here, the letter of the trial court to both counsel was filed of record.

There is, however, some authority to support the proposition that a trial court's prejudgment letter may not serve as findings of fact and conclusions of law. *See Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872, 877–78 (Tex. 1990). *Cherokee Water* concluded that a letter written prior to rendition of judgment did not constitute findings of fact, especially in light of the fact that formal findings of fact and conclusions of law were subsequently filed. *Cherokee Water* has been distinguished in cases where a prejudgment letter expresses the trial court's intent for appellate courts to rely on the letter ruling as the basis for its decision, where no other formal findings are entered. *See Kendrick v. Garcia*, 171 S.W.3d 698, 702 (Tex. App.—Eastland 2005, pet. denied). We recognized this distinction in *Duddlesten*, 2009 WL 635153, at *2. In *Duddlesten*, as in *Kendrick*, the trial court specifically stated the letter expressed its findings and conclusions and did not enter further findings and conclusions, even though request for same was made. Based on these differences with *Cherokee Water*, we concluded in *Duddlesten*, as did the Eastland court in *Kendrick*, that the letter served to establish the trial court's findings of fact and conclusions of law. We further recognized that not every letter written by the trial court to the attorneys will qualify as findings of fact and conclusions of law. *Id.*

Here, the letter ruling, though filed with the clerk, does not specifically state that it is intended to set forth the trial court's findings of fact and conclusions of law. In this regard, the letter states that "[o]utlined below are my findings as to the items referenced above." Here, however, neither party requested findings of fact and conclusions of law from the trial court. In light of these circumstances, we cannot conclude that the trial court intended for this Court to rely on its letter ruling for the basis of its decision. This is especially true in light of the fact that the subsequent judgment conflicts with the trial court's letter on the issue of attorney's fees.[31] The letter therefore cannot logically form the basis of the court's decision on this issue. We recognize that the judgment upon remand reflects the decision of the trial court.[32]

We overrule this point of error.

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:      May 17, 2010
Date Decided:        June 3, 2010

---

[31]The variance between the court's letter ruling and the judgment was not addressed via a motion in the trial court to reform the judgment.

[32]We acknowledge that findings of fact and conclusions of law filed after a judgment are controlling if they conflict with a previous judgment. *Dickerson v. DeBarbieris*, 964 S.W.2d 680, 684 (Tex. App.—Houston [14th Dist.] 1998, no pet.). There is no authority to support the proposition that prejudgment findings of fact and conclusions of law are controlling if they conflict with a subsequent judgment.