In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00106-CV

                                                ______________________________

 

 

 

JEFF MOORE,
D/B/A T&M PRODUCTION, Appellant

 

                                                                V.

                                                                  

JET STREAM INVESTMENTS,
LTD., 

SARA P. RUDD, EXECUTRIX OF
THE ESTATE OF

J.B. RUDD, AND YOUNGBLOOD
PROPERTIES, L.P., Appellees

 

 

                                                                                                  


 

 

                                        On Appeal from the 71st Judicial District Court

                                                           Harrison County, Texas

                                                           Trial
Court No. 05-1140

 

                                                                                                  


 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                        Opinion by Justice Moseley








                                                                   O P I N I O N

 

I.          FACTUAL AND PROCEDURAL
BACKGROUND

            In
its inception, this case involved a dispute between Jeff Moore, d/b/a T&M
Production (who had been the holder of the oil and leasehold estate of certain
realty in Harrison County, Texas) and Jet Stream Investments, LTD, et al. (the
holder of the interests which had been subject to the oil and gas lease),
wherein it had been alleged that the oil and gas lease had terminated under the
terms of the lease for want of production.[1]  The case was instituted and tried as an
action for declaratory judgment.[2]
After a bench trial, the trial court awarded judgment in favor of Jet Stream,
including damages in the amount of $94,752.54, plus attorney’s fees.[3]  On appeal, this Court held, inter alia, that the trial court erred
in awarding damages measured by gross revenue from oil sales, and determined
that Jet Stream’s recovery should be measured by net revenue from oil sales.[4]  As a result of that determination, while
affirming the finding that the lease had terminated, we reversed the award of
damages and remanded that portion of the case to the trial court for further
proceedings consistent with our opinion that Jet Stream’s recovery should be
limited to damages for good-faith trespass (i.e., the value of the minerals
produced minus drilling and operating costs).[5]

            We
further recognized that should the recovery by Jet Stream be substantially
different when a different determination of the measure of damages is employed,
this could also substantially impact the trial court’s determination of the
fairness of the attorney’s fee award.  In
this regard, Moore maintained that because he obtained some relief on rehearing
before this Court, “the award of attorney’s fees for appeal should either be set
aside or awarded to both Appellant and Appellee.”[6]  We recognized that under the facts of this
case, even though the trial court’s award of attorney’s fees would not be an
abuse of discretion, the trial court might choose to exercise its discretion
differently in light of our opinion.  Moore, 261 S.W.3d at 432.  We, therefore, reversed that portion of the
judgment awarding attorney’s fees to Jet Stream and remanded that portion of
the case to the trial court to determine whether, in light of our opinion, an
award of such fees to Jet Stream is “equitable and just.”  Id. 

            Upon
remand, the trial court conducted a trial on June 17, 2009, in which it heard
evidence related solely to the issue of damages and attorney’s fees, per this
Court’s mandate dated January 15, 2009. 
On July 7, 2009, the trial court wrote a letter to counsel for all
litigants which outlined its findings with respect to damages and attorney’s
fees, in accord with the opinion of this Court. 
Thereafter, on August 4, 2009, Moore filed a motion to reopen the
presentation of evidence, which motion was denied after hearing by the trial
court.  The final judgment upon remand,
issued August 21, 2009, awarded Jet Stream damages in the amount of $50,847.16,
representing the net value of the revenues produced.[7]  The judgment further awarded attorney’s fees
to Jet Stream in the amount of $10,000.00 for fees incurred “in the pursuit of
this cause” together with contingent attorney’s fees on appeal.  

II.        ISSUES ON APPEAL

            On appeal, Moore
raises five issues, claiming that the trial court erred in the following
respects:  (1) when it denied Moore’s
motion to reopen evidence to correct the market value of oil produced; (2) when
it failed to include the cost of a letter of credit (which was required by the Texas
Railroad Commission (Commission) as a condition of resuming production) as a
part of the operating costs to be deducted from gross revenues; (3) in its
determination of the value of minerals produced; (4) in failing to give
Moore credit on the judgment for sums previously paid to Jet Stream and for
sums held in suspense by Plains Marketing; and (5) in failing to reform the
final judgment on remand to reflect the award of attorney’s fees as set forth
in the trial court’s July 7, 2007, letter to counsel.  We affirm the judgment of the trial court.

A.        The
Trial Court Appropriately Exercised Its Discretion in Denying Moore’s Motion to
Reopen the Evidence 

 

            Moore
maintains that he discovered, subsequent to the hearing, that the total gross
revenue figure presented by Jet Stream at the hearing was incorrect.  While Moore concedes that twelve days prior
to the hearing, Jet Stream produced the market value figures it relied upon at
trial, he only realized the inaccuracy of those figures when he received records
from Plains Marketing[8]
subsequent to the hearing.  

            The
primary purpose of the mandated hearing was to determine damages for a good-faith
trespass—the value of the minerals minus drilling and operating costs.  Id.
at 430.  Jet Stream offered evidence that
the total gross revenue derived from oil production during the pertinent time
period was $153,158.87.  Kenneth Frazier,
an expert witness called by Jet Stream, testified that the information he
employed to determine total gross revenue was obtained from the Commission.  Frazier explained that the total figure
represented the value of the oil that was actually produced, as opposed to the
value of the oil actually sold.  Said
another way, “total gross revenue” represents the amount of production of oil
from the well multiplied by a standard and recognized market value for oil.[9]
 Finally, Frazier testified that Moore
did not receive the entire $153,158.87—the value of the oil produced—because
oil produced from March 2008 through September 2008 remains in storage on
location.  

            In
his motion to reopen evidence and on appeal, Moore contends that the records
from Plains Marketing, which reflect the purchase price of the oil sold to it,
contradict the figures introduced at trial.[10]   Moore claims the court erred in failing to
reopen the evidence to permit the error in mineral value to be corrected.  

            In
a bench trial, the trial court may permit either party to offer additional
evidence at any time when it clearly appears to be necessary to the due
administration of justice.  Tex. R. Civ. P. 270; In re Estate of Huff, 15 S.W.3d 301, 308
(Tex. App.––Texarkana 2000, no pet.).  A
trial court’s discretion to permit additional evidence “should be exercised
liberally to allow both parties to fully present their case.”  Ex
parte Stiles, 950 S.W.2d 444, 446 (Tex. App.––Waco 1997, no writ).  We review a trial court’s decision to permit
additional evidence under an abuse of discretion standard.  In re
J.A.H., 996 S.W.2d 933, 935 (Tex. App.––Waco 1999, no pet.).  The test for abuse of discretion is whether
the court acted without reference to guiding rules and principles.  Cire v.
Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004).  In deciding whether to permit additional
evidence, a trial court may consider (1) whether the movant showed due
diligence in obtaining the evidence; (2) whether the additional evidence is
decisive; (3) whether reopening the evidence will cause undue delay; and (4)
whether reopening the evidence will cause injustice.  Huff,
15 S.W.3d at 308.  

            We
now apply these factors to the facts of this case to determine if the trial
court acted within its discretion in denying Moore’s motion to reopen. 

                        (1)        Due Diligence

            The
hearing concluded June 17, 2009.  On July
7, 2009, the trial court wrote a letter to counsel advising of its ruling on
the merits.  Moore’s motion to reopen the
evidence was filed August 4, 2009.  Moore
contends that even though the motion was filed in August after trial in June,
due diligence was exercised because he was not aware of the discrepancy in the
evidence on mineral value until that time. 


            At
the hearing in June, Moore made no attempt to present independent evidence of
the value of the minerals which were produced or sold.  Moreover, there is no contention that the
evidence Moore sought to introduce via his motion to reopen was unavailable to
him at the time of trial.  Indeed, it
appears that this evidence was readily available to Moore prior to trial.  Counsel for Moore was candid in advising the
court at the motion to reopen that there was access to this evidence “all
along.”  When asked about the
availability of the records regarding mineral value, O’Bannon (the sponsoring
witness of the evidence in question) confirmed that such records were available
at the time of trial.[11]
 Likewise, Moore does not dispute the
availability of that evidence at the time of trial.[12]  Given these facts, we are compelled to
conclude that there has been a failure to show diligence in attempting to
produce the evidence in a timely fashion. 
Where the party seeking to reopen has not shown such diligence, a trial
court does not abuse its discretion by refusing to reopen a case after evidence
is closed.  McNamara v. Fulks, 855 S.W.2d 782, 784 (Tex. App.––El Paso 1993, no
writ). 

                        (2)        Decisive
Evidence

            Frazier testified that the value of
the production for the pertinent time period was $153,158.87.  This evidence was undisputed at trial.[13]  O’Bannon testified at the hearing on motion
for new trial that the value of the minerals it purchased (as opposed to the
value of the minerals actually produced) was $146,730.22.  This figure represents the value of the
minerals purchased by Plains Marketing, while the value proffered by Frazier
represents the value of total production. 
Moreover, there is no dispute that oil was produced, but not sold,
between March and September 2008.  The
uncontroverted evidence admitted at trial reflects the value of minerals
produced, but unsold, to be $6,859.50. 
The two sets of figures are easily reconciled, and the difference
between the two essentially has to do with a value measured by minerals sold
versus the value measured by minerals produced.[14]   Evidence of the value of oil actually sold
is not decisive because it does not represent the value of all of the minerals.[15]




 

                        (3)        Undue
Delay

            Moore
contends that reopening the record would not have caused undue delay because it
was only a matter of presenting production figures into evidence.  However, when one takes into account the
protracted trial and appellate history of this case, the trial court could well
have determined that further delay would be undesirable; the trial court was of
the opinion that the matter had previously been subject to perhaps excessive
delay between the date this Court issued its opinion and the hearing on remand.[16]


            Further,
although Moore indicated that all he wanted to do if he was allowed to reopen
was introduce only a small amount of evidence, the trial court is obligated to
permit both sides to fully develop the case if a reopening is allowed.  Huff,
15 S.W.3d at 308.  Therefore, there might
have been a more lengthy presentation than Moore anticipated. 

            When
weighed against the rather lengthy history of this case, any delay occasioned
by the reopening of the evidence could easily be deemed less than
desirable.  

                        (4)        Injustice

            We cannot say that
the admission of the evidence proffered by Moore regarding the value of the
minerals sold was necessary to the due administration of justice when one takes
into account the fact that the record reflected the existence of competent
evidence of the value of the minerals, in compliance with this Court’s
directive.  We further observe that had the
motion to reopen been granted, Moore would have essentially been afforded the
opportunity to retry his case, after having already been given the trial
court’s letter ruling.  The trial court could
reasonably conclude that Moore’s desire to offer additional evidence was
related to its letter ruling.  Here, the
interests of justice do not warrant a second bite at the apple.

            When
each of these factors is taken into account, the fact remains that Moore did
not show diligence in attempting to produce the available evidence in a timely
fashion.  The interests of justice do not
warrant a reopening of the evidence.  The
trial court did not abuse its discretion in denying Moore’s request to reopen
the evidence.  See McNamara,
855 S.W.2d at 784.  We overrule this
point of error.

            B.        The
Damage Award Was Supported by the Evidence

            In his second
point of error, Moore contends that the $2,000.00 cost for Moore to obtain a
letter of credit should have been included as a part of the operating costs to
be deducted from the value of the minerals in order to determine damages.[17]  Moore further contends that certain
additional expense items should have been included within the category of
operating costs, including (1) pumping expenses of $1,500.00 per month;[18]
(2) the cost of a pumper to check the well during the time the well was
nonoperational; and (3) miscellaneous expenses of $4,989.91.  Moore urges that a clear reading of the
ruling of the trial court adopted all expenses Moore submitted, totaling
$114,552.12 and that he is entitled to a credit against the value of the
minerals in this amount.  We disagree.

            Neither
Moore nor Jet Stream requested findings of fact and conclusions of law, and for
reasons we will discuss later in this opinion, the trial court’s letter to counsel
of July 7, 2009, cannot be considered as such. 


            In
the absence of formal findings of fact and conclusions of law, the trial
court’s judgment must be affirmed if it can be upheld on any legal theory that
finds support in the evidence.  Worford v. Stamper, 801 S.W.2d 108, 109
(Tex. 1990); Rosa’s Café, Inc. v.
Wilkerson, 183 S.W.3d 482, 486 (Tex. App.––Eastland 2005, no pet.).  The trial court’s determination that the net
value of revenues produced was $50,847.16 is supported by evidence.  

            At
the June hearing, the uncontroverted evidence established that the value of
minerals produced was $153,158.57.  After
mineral value was established, Moore introduced evidence of claimed operating
costs totaling $114,552.12.  Those costs
included pumping expenses of $1,500.00 per month for thirty-seven months,
$750.00 for one month, and $500.00 per month for nine months,[19]
for total pumping expenses of $60,750.00. 
In addition, Moore presented evidence of the cost of the letter of
credit, as well as those expenses categorized as “miscellaneous” in the amount
of $4,989.91.[20]  

            Frazier
testified on behalf of Jet Stream that operating costs attributable to
production totaled $69,011.71.[21]  Of this amount, $22,200.00 represents pumping
costs at a rate of $400.00 per month.[22]  Frazier was also of the opinion that neither
the expense related to the issuance of a letter of credit,[23] nor
the miscellaneous expenses offered by Moore, were chargeable expenses of well
operation. 

            In
a nonjury trial or hearing, the trial court is the sole judge of the witness’s
credibility and the weight to be afforded the testimony.  Tate v.
Commodore County Mut. Ins. Co., 767 S.W.2d 219, 224 (Tex. App.––Dallas
1989, writ denied).  The trial court, as
the fact-finder, has the right to accept or reject all or any part of any
witness’s testimony.  Griffin Indus., Inc. v. Honorable Thirteenth
Court of Appeals, 934 S.W.2d 349, 357 (Tex. 1996).  The trial court may believe one witness and
disbelieve others, and may resolve inconsistencies in any witness’s testimony.  Id.  Accordingly, the court was free to base its
decision upon the testimony offered by Jet Stream or by Moore or on a
combination of all of the evidence introduced at trial.  Here, the trial court’s damage figure is
supported by ample evidence.[24]  

            We
further observe that in the absence of findings of fact and conclusions of law,
a determination of the precise evidence upon which the judgment is based is
mere speculation.     Because there is evidence to support the
judgment rendered, we overrule this point of error.

            C.        The
Trial Court Did Not Err in Determining the Value of the Minerals 

            There
are three mineral values at issue.  The
first is the value of the oil produced, which was proven at trial to be
$153,158.57.  The second value is that of
the minerals actually sold, this being $146,730.00.  The final value (the one proposed by Moore on
appeal to be determinative) is the value of the minerals sold, less severance
taxes.  This value is $139,962.90.  Moore claims the trial court erred when it
found the value of the oil produced to be $153,158.87.  We disagree.

            First,
and as previously discussed, the evidence introduced at trial supports the
value of the oil produced as being $153,158.57. 
In fact, this evidence was not controverted.  Moreover, while evidence supporting Moore’s
assertion of mineral value as $139,962.90 was introduced at the hearing on
motion for new trial, no such evidence was introduced at trial.  Thus, the trial court could not have erred in
failing to find the mineral value to be an indeterminate number unsupported by
the evidence.[25]  Moore does not claim on appeal that the trial
court erred in overruling his motion for new trial.

            Moreover,
we perceive this argument to be somewhat disingenuous.  Jet Stream’s trial exhibit 3 sets forth all
of the information necessary to establish the value of the oil produced.  This exhibit provides the following
information:

                                    Oil
(BBL)              Oil (BBL)


 
 
  
 DATE
 
 
  
 Production
 (Source: Texas RRC Website - Ex. “A”)
 
 
  
 Disposition
 (Source: Texas RRC Website - Ex. “A”)
 
 
  
 Actual Cost Ex/
 “C” and Avg. Annual/Monthly Oil Price (Source: EIA Website WTI - Ex. “B” (See
 Fn)
 
 
  
 Revenue from Oil
 Sales
 
 
 
 
 Aug.-05
 
 
        278                 
 
 
        176
 
 
      $62.49
 
 
    $10,998.77
 
 
 
 
 Sept.-05
 
 
        151
 
 
        290
 
 
      $63.00
 
 
    $18,268.84
 
 
 
 
 Oct.-05
 
 
        153
 
 
        143
 
 
      $59.89
 
 
     $8,563.56
 
 
 
 
 Nov.-05
 
 
        152
 
 
        162
 
 
      $56.00
 
 
     $9,072.49
 
 
 
 
 Dec.-05
 
 
        103
 
 
        103
 
 
      $56.77
 
 
     $5,846.80
 
 
 
 
 Jan.-06
 
 
         86
 
 
         86
 
 
      $62.99
 
 
     $5,416.71
 
 
 
 
 Mar.-06
 
 
         37
 
 
         80
 
 
      $60.69
 
 
     $4,854.88
 
 
 
 
 May-06
 
 
        127
 
 
        178
 
 
      $68.48
 
 
    $12,188.73
 
 
 
 
 Jun.-06
 
 
         71
 
 
         88
 
 
      $60.28
 
 
     $5,304.90
 
 
 
 
 Aug.-06
 
 
         95
 
 
         99
 
 
      $70.37
 
 
     $6,966.23
 
 
 
 
 Sept.-06
 
 
       136
 
 
        134
 
 
      $61.81
 
 
     $8,282.00
 
 
 
 
 Jan.-07
 
 
        59
 
 
        119
 
 
      $52.32
 
 
     $6,225.72
 
 
 
 
 May-07
 
 
        21
 
 
        110
 
 
      $60.94
 
 
     $6,703.18
 
 
 
 
 Oct.-07
 
 
        139
 
 
        144
 
 
      $83.20
 
 
    $11,980.22
 
 
 
 
 Nov.-07
 
 
        120
 
 
        161
 
 
      $92.87
 
 
    $14,952.71
 
 
 
 
 Feb.-08
 
 
          5
 
 
        116
 
 
      $92.01
 
 
    $10,673.62
 
 
 
 
 Mar.-08
 
 
          7
 
 
          0
 
 
     $105.45
 
 
       $738.15
 
 
 
 
 Apr.-08
 
 
        10
 
 
          0
 
 
     $112.58
 
 
     $1,125.80
 
 
 
 
 May-08
 
 
        12
 
 
          0
 
 
     $125.40
 
 
     $1,504.80
 
 
 
 
 Jul.-08
 
 
         9
 
 
          0
 
 
     $133.37
 
 
     $1,200.33
 
 
 
 
 Sept.-08
 
 
        22
 
 
          0
 
 
     $104.11
 
 
     $2,290.42
 
 
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 


                                   Total Gross Revenue since January
2005                     $153,158.87

            The
information in Jet Stream’s exhibit 3, as set forth in the referenced table, reflects
gross revenue for total oil sold (disposed of) from August 2005 through
February 2008.  However, from March 2008
through September 2008, exhibit 3 reflects that fifty-three barrels of oil were
produced, but not sold.  The value of
this oil (produced, but not sold) totals—according to the average
annual/monthly oil price[26]—$6,859.50.   

            On
appeal, Moore claims the total value of the oil produced was $146,730.00.[27]  Moore then claims that amounts paid for
severance taxes should be deducted, to arrive at the value of the minerals less
operating expenses.  Moore’s argument
fails for two reasons.  First, Moore’s
premise is incorrect; the evidence clearly establishes that the value of the
oil produced was $153,158.87.  Moreover,
there is no evidence that the value of the oil produced was $146,730.00, as
Moore contends.  Moore testified that the
value of oil sold through February 2008, as reflected on Jet Stream’s exhibit
3, is correct.  Further, Moore agreed
that the amount of production listed on exhibit 3 for March 8 through September
8 is correct; in fact, this is a recapitulation of what Moore reported to the
Commission.  Even though he did not
dispose of the oil produced from March 8 through September 8, Moore agreed that
the value of minerals produced was $153,158.87 (due to the fact that some oil
remained unsold at the time of trial).

            This testimony directly contradicts
Moore’s position on appeal, i.e., that the value of the minerals produced
amounts to only $146,730.22.  In fact,
Moore acknowledged that the value of the oil sold is $146,730.22.  O’Bannon, the sponsoring witness of the
evidence offered at the motion for new trial, acknowledged that his numbers
only represented the amount of oil purchased from Moore by Plains Marketing.[28]  The only evidence of the value of the oil
produced was that offered by Jet Stream and acknowledged by Moore to be
correct.[29]

            Moore’s
third appellate point cannot be sustained for the further reason that no
evidence was introduced at trial reflecting the amount of severance taxes paid
on this amount.  Because no such evidence
was before the trial court, such evidence cannot be considered on appeal.  Tex.
R. App. P. 33.1.

            We
overrule this point of error.

            D.        Sums Previously Paid and Currently Held
in Suspense by Plains Marketing

            At
the hearing on motion for new trial, O’Bannon testified that funds were held in
suspense by Plains Marketing until further orders of the court.  However, $6,106.04 of the funds which should
have remained in suspense were actually paid out to Jet Stream for production
between August 2005 and January 2007. 
Moore further claims the sum of $2,641.27 currently remains in suspense
for production between January 2007 and the present.  Moore contends that (1) he is entitled to
receive a credit against the judgment for the payment to Jet Stream in the
amount of $6,106.04 and (2) he is entitled to receive a credit against the judgment
in the amount of $2,641.27, the amount which currently remains in suspense. 

            Moore
testified at the hearing on motion for new trial that Jet Stream was previously
paid $6,107.04 from production funds. 
With respect to the question of whether Moore is entitled to a credit
against the judgment in this amount, we note that no such evidence was before
the trial court at the time of trial. 
Evidence of production funds paid to Jet Stream was disclosed at the
hearing on the motion for new trial. 
Additionally, the information contained on exhibit 1 (Plains Marketing
Accounting Summary) and introduced at the hearing on motion for new trial was
likewise not before the trial court at the time of the trial.  The issue of whether Moore is entitled to a
credit for past production paid to Jet Stream was raised solely in connection
with Moore’s motion for new trial, the denial of which has not been
appealed.  Because this issue has not
been preserved for appeal, we may not consider it.  Tex. R.
App. P. 33.1.  We, therefore,
overrule this point of error.

            Moore
next contends that he is entitled to receive a credit against the judgment in
the amount of $2,641.27, which currently remains in suspense.   This
issue is rendered moot by the judgment upon remand, which provides:

IT IS FURTHER ORDERED, that any purchaser of
production from the W.L. Rudd B Lease # 00831, upon this Judgment becoming
final, is ordered to pay over to the Plaintiffs all amounts maintained in
suspense, from said lease, to be applied to the Judgment.

 

            We,
therefore, do not address this issue, as it is moot.

            E.        Modification
of the Judgment to Change the Attorney’s Fee Award

            In his final point
of error, Moore maintains that the judgment upon remand should be modified to
change the attorney’s fee award.  We
disagree.

            The
judgment upon remand provides, in part:

IT IS FURTHER ORDERED, that Plaintiffs receive
their reasonable and necessary attorney’s fees in the amount of Ten Thousand
and No/100 Dollars ($10,000.00), for the attorney’s fees incurred in the
pursuit of this cause, together with contingent amounts in the event of an
unsuccessful appeal by the Defendant in the amount of Ten Thousand and
No/Dollars ($10,000.00) if this Judgment is unsuccessfully appealed to the
Court of Appeals; an additional Ten Thousand and No/100 Dollars ($10,000.00) if
a Petition for Review is filed with the Supreme Court of Texas and is
unsuccessful; and an additional Ten Thousand and No/Dollars ($10,000.00) if the
Petition for Review is granted and the Supreme Court denies relief to the
Defendant.

 

            Moore relies on the letter ruling of
the trial court of July 7, 2009, which states:

Concerning the issue of
“equitable and just attorney fee,” the following fees are award [sic] to
Plaintiff as “equitable and just”

 

$10,000.00 as originally
awarded for the Trial Level Disposition.

 

The “good faith trespass”
finding reflected in the Appellate Opinion, however, raises concerns as to the
“equitable and just” status for awarding Attorney Fees to the Plaintiffs on
appeal a concern that is compounded by language in Plaintiff’s Original and
Amended Petition in the case at hand that “. . . contingent amounts as attorney’s fees in the event of unsuccessful
appeals by the Defendant.”  Based on
the concerns stated the award of Contingent Attorney Fees on Appeal to the
Plaintiff would not be “equitable and just.” 
Appellate Attorney Fees shall be paid by the incurring parties.

 

            The
resolution of this issue depends, at least in part, upon the accurate
characterization of the trial court’s letter to counsel dated and filed on July
7, 2009.  Accordingly, we will examine
this communication to determine whether it can correctly be characterized as
findings of fact and conclusions of law.[30]            

            Findings
of fact and conclusions of law need not be in any particular form so long as
they are in writing and be “filed with the Clerk and shall be part of the
record.”  Villa Nova Resort, Inc. v. State, 711 S.W.2d 120, 124 (Tex. App.––Corpus
Christi 1986, no writ); see Tex. R. Civ. P. 297.  Thus, it is possible for findings of fact and
conclusions of law to be contained in a trial court’s letter to counsel if such
a letter is filed of record.  Duddlesten v. Klemm, No. 06-08-00106-CV,
2009 WL 635153, at *2 (Tex. App.––Texarkana Mar. 13, 2009, no pet.) (mem. op.).  Here, the letter of the trial court to both
counsel was filed of record.

            There
is, however, some authority to support the proposition that a trial court’s
prejudgment letter may not serve as findings of fact and conclusions of
law.  See
Cherokee Water Co. v. Gregg County Appraisal Dist., 801 S.W.2d 872, 877–78
(Tex. 1990).  Cherokee Water concluded that a letter written prior to rendition
of judgment did not constitute findings of fact, especially in light of the
fact that formal findings of fact and conclusions of law were subsequently filed.  Cherokee
Water has been distinguished in cases where a prejudgment letter expresses
the trial court’s intent for appellate courts to rely on the letter ruling as
the basis for its decision, where no other formal findings are entered.  See
Kendrick v. Garcia, 171 S.W.3d 698, 702 (Tex. App.––Eastland 2005, pet.
denied).  We recognized this distinction
in Duddlesten, 2009 WL 635153, at *2.  In Duddlesten,
as in Kendrick, the trial court
specifically stated the letter expressed its findings and conclusions and did
not enter further findings and conclusions, even though request for same was
made.  Based on these differences with Cherokee Water, we concluded in Duddlesten, as did the Eastland court in
Kendrick, that the letter served to
establish the trial court’s findings of fact and conclusions of law.  We further recognized that not every letter
written by the trial court to the attorneys will qualify as findings of fact
and conclusions of law.  Id. 


            Here,
the letter ruling, though filed with the clerk, does not specifically state
that it is intended to set forth the trial court’s findings of fact and
conclusions of law.  In this regard, the
letter states that “[o]utlined below are my findings as to the items referenced
above.”  Here, however, neither party
requested findings of fact and conclusions of law from the trial court.  In light of these circumstances, we cannot
conclude that the trial court intended for this Court to rely on its letter
ruling for the basis of its decision. 
This is especially true in light of the fact that the subsequent
judgment conflicts with the trial court’s letter on the issue of attorney’s
fees.[31]  The letter therefore cannot logically form
the basis of the court’s decision on this issue.  We recognize that the judgment upon remand
reflects the decision of the trial court.[32]  

            We
overrule this point of error.

            We
affirm the judgment of the trial court.

 

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          May
17, 2010

Date Decided:             June
3, 2010

 











[1]In
Moore v. Jet Stream Investments, LTD,
261 S.W.3d 412 (Tex. App.––Texarkana 2008, pet. denied), this Court
addressed Moore’s appeal of the trial court’s judgment declaring that an oil
and gas lease had terminated due to nonproduction.  Moore operated the lease, which contained a
five-year primary term and continued thereafter as long as oil or gas was
produced.  On August 20, 2004, after
Moore failed to comply with an order from the Texas Railroad Commission
regarding posting financial assurance, the Commission ordered that he cease
production.  Production did not resume
until July 15, 2005.  Shortly after Moore
resumed production, William L. Rudd, III, acting “[o]n behalf of the mineral
owners,” sent Moore a letter alleging the lease had terminated.  Jet Stream Investments thereafter brought
suit seeking a declaratory judgment that the lease had terminated.  After granting Jet Stream’s motion for partial
summary judgment, the case proceeded to trial on the merits, with judgment
rendered in favor of Jet Stream.  

 





[2]We
have pointed out in our recent case of Ramsey
v. Grizzle, No. 06-09-00026-CV, 2010 WL 1980247 (Tex. App.––Texarkana May
19, 2010, no pet. h.), that such a controversy (i.e., whether a leasehold
estate has reverted due to cessation of operations) is properly brought as an
action in trespass to try title and not as an action for declaratory
judgment.  Unlike the Ramsey case, no complaint of this nature
was raised here and the issue would, therefore, be unassigned or unpreserved
error which we cannot entertain.  Tex. R. App. P. 33.1.  The Texas Supreme Court has allowed
consideration of unassigned error only in cases wherein the jurisdiction of the
appellate court is questionable and in cases involving quasi-criminal matters.  In re
B.L.D., 113 S.W.3d 340, 350 (Tex. 2003). 
This case fits into neither category and our previous opinion has become
final.

 





[3]Of
this amount, $85,521.11 represented revenue received by Moore from the
termination of the lease, and $9,231.13 represented underpayment of
royalty.  





[4]Damages
measured by gross revenue from oil sales were based upon bad-faith
trespass.  Because we determined that
Moore’s trespass was done in good faith, damages are appropriately measured by
net revenue from oil sales. 

 





[5]Moore, 261 S.W.3d at 430. 

 





[6]Id. at 431.  Jet Stream requested and obtained attorney’s
fees under the Declaratory Judgments Act. 
Under Section 37.009, a trial court may award reasonable and necessary
attorney’s fees that are “equitable and just.” 
Tex. Civ. Prac. & Rem. Code
Ann. § 37.009 (Vernon 2008).  When
a judgment is reversed on appeal, the reversal may affect whether the award of
attorney’s fees is equitable and just.  Sava Gumarska in Kemijska Industria D.D. v.
Advanced Polymer Scis., Inc., 128 S.W.3d 304, 324 (Tex. App.––Dallas 2004,
no pet.).





[7]The
judgment confirmed the previous award of underpaid royalty in the amount of
$9,231.13, together with post-judgment interest from and after June 12, 2007.

 





[8]Plains
Marketing purchased and marketed the oil from Moore’s producing wells.  





[9]The
total production figures were reported by Moore to the Commission.  

 





[10]At
the hearing on Moore’s motion for new trial, Jim O’Bannon, a crude oil representative
from Plains Marketing, testified that total production for this lease,
including severance taxes, is valued at $146,730.00.  When severance taxes are deducted, the
mineral value is $139,962.90.  These
figures are based on records reflecting amounts that Plains Marketing paid for
the oil it purchased.  O’Bannon does not
know what was actually produced; he knows what Plains Marketing purchased.  However, Plains Marketing bought all of the
production from the lease with the exception of what might have been in the
tanks at the time of the hearing.  





[11]O’Bannon
testified at the motion for new trial:

 

                Q             [By
Plaintiffs’ Counsel]  Okay.  And so if this trial was held in June of
2009, had this -- had the Defendant wanted to obtain these records, he could
have obtained this record and presented it; is that correct?

 

                A             [By O’Bannon] 
Yes, sir.

 





[12]Moore
testified at the motion for new trial:

 

                Q             [By
Plaintiffs’ Counsel]  Mr. Moore, is there
one item of information that you’re asking now for the Court to look at in
making a determination of a new trial that wasn’t available to you prior to our
trial in June?

 

                A             [By
Moore]  Probably not.





[13]In
fact, Moore confirmed that the figure of $153,158.87 represents the value of
the minerals produced.  

 





[14]To
the extent Moore claims trial court error for failing to reopen the evidence
for the purpose of showing the amount of severance taxes paid, we note that the
request to reopen was not made for that purpose.  However, we recognize that information
regarding the amount of severance taxes paid was likewise available to Moore at
the time of trial.  The source of Moore’s
evidence is the same for both the production data and the severance taxes.  

 





[15]In
our previous opinion, the trial court was asked to determine the “value of the
minerals” in order to subtract the costs of drilling and production.  We did not limit the phrase “value of the
minerals” to include only the value of those minerals actually sold.  Moore,
261 S.W.3d at 430.  

 





[16]Our
opinion was issued in August 2008, and the hearing on remand took place in June
2009.





[17]Moore
was required by the Commission to obtain a $2,000.00 letter of credit in order
to continue to operate the wells in question. 


 





[18]We
do not address this area of damage, as Moore concedes that this expense was
included in the operating costs. 





[19]The
latter two items represent the cost of a pumper to check the well during the
time the well was nonoperational.

 





[20]Miscellaneous
expenses were for cell phone and postage; cell phone expenses were not
allocated on a per lease basis. 





[21]In
making this calculation, Frazier utilized Moore’s expense figures with respect
to the following costs:  (1) electric;
(2) supplies; (3) record keeping; (4) well servicing; (5) general lease work;
(6) chemicals; and (7) taxes and insurance. 


 





[22]The
difference in the parties’ evidence on pumping expenses is $38,550.00.

 





[23]Moore
contends that because the trial court issued an oral pronouncement from the
bench (at the hearing on Moore’s motion for new trial), it intended for Moore
to recover the cost of the letter of credit, he is entitled to a credit for
same.  An oral pronouncement from the
bench regarding a signed and filed judgment carries no weight in and of
itself.  The trial court had plenary
jurisdiction to modify the judgment when such pronouncement was made.  See,
e.g., L.M. Healthcare, Inc. v. Childs,
929 S.W.2d 442, 443 (Tex. 1996).  A
motion to modify judgment, the appropriate procedural vehicle for the relief
requested, was not filed.  Tex. R. Civ. P. 329b(g) (“A motion to
modify, correct, or reform a judgment . . . , if filed, shall be filed and
determined within the time prescribed by this rule for a motion for new trial
and shall extend the trial court’s plenary power . . . in the same manner as a
motion for new trial.”). 





[24]For
example, the trial court could have found that the value of the minerals
produced—$153,158.57—minus the operating expenses offered by Jet Stream—$69,011.71—would
have entitled Jet Stream to recover $84,146.86. 
The award of the court—$50,847.16—being less than that amount, is
supported by the evidence.  Likewise, the
trial court could have determined that the cost of the letter of credit and the
miscellaneous expenses were not properly chargeable as operating expenses,
based on Frazier’s testimony.  It may
also have opted for inclusion of Moore’s expenses with respect to pumping
costs, in combination with a reduction of other expenses, as mentioned
above.  We conclude that in each of these
scenarios, the decision of the trial court with respect to the damages for
good-faith trespass—the value of the minerals produced minus drilling and
operating expenses—is supported by the evidence.





[25]Moore
maintains that at trial, he did not agree that the amounts listed on Jet Stream’s
exhibit three outlining mineral values were accurate.  He further contends that there was no expert
testimony regarding the actual value of the oil produced.  This is incorrect.  Frazier created Jet Stream’s exhibit 3, and
explained in detail the basis for the numbers included on that exhibit.  

 





[26]The
average annual/monthly oil price is not in dispute.

 





[27]O’Bannon
testified at the hearing on motion for new trial that the “lease net” is
actually $139,962.90.  The “gross value”—or
taxable value— is the lease net amount of $139,962.90, plus severance taxes in
the amount of $6,767.35, yielding a gross value of $146,730.00.  Evidence regarding severance taxes was not
before the trial court at the time of trial, and therefore cannot be considered
on appeal.  Tex. R. App. P. 33.1.  

 





[28]O’Bannon
testified as follows:

 

                Q             [By Plaintiffs’ Counsel]  Okay. 
Now - - so if we wanted to know what the value of the production was
that Plains Marketing purchased, you would agree that it’s $146,730.22?

 

                A             [By O’Bannon]  Yes.

 

                Q             Okay.  And now, if there was other amounts that had
been produced but has not yet been sold, you wouldn’t have any records
concerning those, would you?

 

                A             No, sir.

 

                Q             And of course, that would also have
value - - if there were oil still in the tanks or if there was oil that wasn’t
purchased by Plains, those - - you would not have any record concerning that.

 

                A             That is correct.  





 

[29]It
is unclear whether Moore contends on appeal that the correct measure of mineral
value is the value of the oil sold versus the value of the oil produced.  We conclude that the trial court correctly
based its judgment on the value of the oil produced.  





[30]Moore
does not explicitly claim the trial court’s letter of July 2009 amounts to
formal findings of fact and conclusions of law; however, the content of the
letter is treated as controlling and, thus, we recognize an implicit reliance
upon the authority of the letter as findings of fact and conclusions of
law.  





[31]The
variance between the court’s letter ruling and the judgment was not addressed
via a motion in the trial court to reform the judgment.

 





[32]We
acknowledge that findings of fact and conclusions of law filed after a judgment
are controlling if they conflict with a previous judgment.  Dickerson
v. DeBarbieris, 964 S.W.2d 680, 684 (Tex. App.––Houston [14th Dist.] 1998,
no pet.).  There is no authority to
support the proposition that prejudgment findings of fact and conclusions of
law are controlling if they conflict with a subsequent judgment.